2021 IL App (3d) 210255

Opinion filed December 13, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| BROOK COUTANT, | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Petitioner-Appellee, | ) | Kankakee County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-21-0255 |
| | ) | Circuit No. 21-OP-264 |
| JEAN DURELL, | ) | |
| | ) | The Honorable |
| Respondent-Appellant. | ) | Scott N. Sliwinski, |
| | ) | Judge, presiding. |

JUSTICE DAUGHERITY delivered the judgment of the court, with opinion.
Presiding Justice McDade concurred in the judgment and opinion.
Justice Holdridge concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1        Petitioner, Brook Coutant, filed a verified petition for a stalking no contact order to be entered against respondent, Jean Durell, pursuant to the Stalking No Contact Order Act (Act) (740 ILCS 21/1 *et seq.* (West 2020)), with Brook listing herself as the petitioner and her three minor children as other protected parties. Initially, the trial court granted Brook's petition on an emergency basis for 21 days and, subsequently, after a hearing, entered a two-year plenary stalking no contact order for Brook and her three minor children against Jean. Jean appealed, arguing: (1) the trial court erred in entering the plenary stalking no contact order where the trial

court failed to identify two or more acts necessary to establish a "course of conduct"; (2) the Act did not intend for a single two-hour isolated incident to constitute two or more acts required to establish a course of conduct; and (3) there was no evidence to support the inclusion of the minors in the stalking no contact order. We affirm the trial court's plenary stalking no contact order against Jean in relation to Brook as the petitioner and vacate the order as to the minor children as additional protected parties.

¶ 2                                I. BACKGROUND

¶ 3        The incident at issue took place on the evening May 1, 2021, and involved phone calls, voicemail messages, and text messages from Jean to Brook. Brook and Reginald Coutant were previously married and had divorced. Brook and Reginald had three children together (the minors). As of May 1, 2021, Reginald and Jean were in a dating relationship and lived together in Jean's house. For more than a year, Brook and Reginald's three minor children had been staying with Reginald and Jean, in Jean's home, during Reginald's parenting time.

¶ 4                    A. Brook's Verified Petition for Stalking No Contact Order

¶ 5        On May 3, 2021, Brook filed a verified petition in the trial court for a stalking no contact order against Jean. In filing the petition, Brook named herself as the petitioner and listed names of her three children (the full names of J.C, A.C., and M.C.) as "other protected parties."

¶ 6        In the petition, Brook alleged that on May 1, 2021, at 9 p.m., Jean started texting her while Brook was at work, sending "many threatening texts threatening [Brook's] job, to beat [Brook] up, threatening to tell the children that their mom is a whore and that [Jean] was going to tell them sexually explicit content to them [*sic*]." Brook further alleged that Jean left many voicemails as well, and that the minors could be heard in the background of one message. Brook

2

stated that she previously had to have a restraining order entered against Jean "for stalking and threatening."

¶ 7                                      B. Emergency Stalking No Contact Order

¶ 8            On May 3, 2021, the trial court held a hearing. Brook appeared *pro se*, and Jean was not present for the hearing. Brook was sworn, and she testified that on May 1, 2021, Jean called her cellphone multiple times, left six voicemails, and sent Brook "a lot of threatening texts." Brook further testified that in the texts Jean was "threatening that she was going to beat me up; threatening that she was going to tell everyone at my new job about who I am; threatening to tell my children that I was a whore and tell them sexually explicit comments about the man that I am seeing; threatening to tell [J.C., her oldest child] who they are." Brook testified that she did not respond to Jean's texts. Brook stated that on May 1, 2021, the minors were with Reginald at Jean's home for the weekend and on the voicemails that Jean had left, Brook could hear the minors in the background, which was concerning to Brook that "they're listening to this" because the content was "very explicit." Brook presented her phone to the trial court, and the voicemails were played in court but were not transcribed into the record. The trial court found "the actions on the part of [Jean] constitute[d] stalking." The trial court further found that it was necessary to "grant the relief requested" on an emergency basis in order to prevent further harm or abuse. The trial court entered a 21-day emergency stalking no contact order for Brook and the minors against Jean, prohibiting Jean from: threatening to commit or committing stalking personally or through a third party; contacting Brook and the minors in any way, directly, indirectly, or through third parties, including with phone, written notes, mail, email, or fax; and coming within 500 feet of Brook and the minors, their residence, school, and place of

employment. The trial court informed Brook that if she wanted to extend the order beyond 21 days, she would have to return for the next court date.

¶ 9                    C. Hearing for a Plenary Stalking No Contact Order

¶ 10        On May 24, 2021, a hearing took place for an extension of the stalking no contact order. Brook and Jean both appeared in court and were represented by their attorneys. The evidence showed that the parties had known each other for about four years prior to May 1, 2021.

¶ 11        The evidence also indicated that on May 1, 2021, Brook had made multiple calls to Reginald's phone in an attempt to speak with the minors before she went to work. Pursuant to a court order (presumably in Brook and Reginald's divorce case), Brook was allowed to call to speak with the children "[d]aily between 5 p.m. and 6 p.m." Brook stated that she had called Reginald's phone because "[t]he children's phones were blocked" and per the court order she was to call Reginald's phone if she was unable to get in touch with the children. Reginald testified, "the kids phones get blocked all the time because it's out of control," but they were allowed to call Brook every day. Reginald testified that he did not give the children his phone to call Brook that day, but if they had asked for it, they could have used it to call Brook.

¶ 12        After not being able to reach the children on their phones, Brook called Reginald's phone twice, at 5:43 and 5:46 p.m., but there was no answer. Brook called Reginald's phone again at 5:48 p.m. Jean answered Reginald's phone, Jean informed Brook that the minors were busy and would call her back, and Jean hung up. Brook testified that Jean said something like the kids are fucking busy, stop fucking calling them, they'll call you later, and then hung up. Brook did not speak at all during that phone call. At the time of Brook's first three phone calls, Reginald's phone was with Jean in the pole barn, which was "a distance" away from the house. At that time

4

Reginald was out with the children (the three minors and their two friends), and the children were riding all-terrain vehicles at that time.

¶ 13    Brook testified that after attempting those initial calls to Reginald's phone, she then sent a text to Reginald's phone, indicating that she could not get in touch with the kids. She then called Reginald's phone again (a second call at 5:48 p.m.). Jean testified that she answered Reginald's phone on speaker, Brook said, "I'm going to kick your ass," and Jean hung up. Brook, on the other hand, testified that she had recorded that phone call, and Jean had stated, "you're a fucking whore and everyone's gonna know you're a fucking whore." Brook then asked to speak to her daughter, stating that it was her time, but Jean hung up before she could finish. Brook called back one minute later at 5:49 p.m.. Jean testified that she again answered Reginald's phone on speaker, told Brook "stop," and hung up. Brook testified that she had recorded that call and Jean did not say "stop." Brook did not recall what Jean had said, but it was not "stop"; rather, it was "some inappropriate language."

¶ 14    Brook testified that at no point in any of the phone calls did she threaten Jean, did she tell Jean that she was going to "kick her ass," or did Jean answer the phone and say "stop." Jean testified that Reginald had walked into the pole barn at the time of the second call at 5:48 p.m. (when Brook allegedly stated, "I'm going to kick your ass") and the call at 5:49 p.m. (when Jean had allegedly told Brook "stop"). Reginald testified that he heard Brook on the call in which she stated, "I'm going to kick your ass," and heard the call during which Jean said, "stop." Reginald also testified that he was aware that Brook was calling between 5 p.m. to 6 p.m. to speak with the children, his phone was available (in the pole barn) for the children to call her, and (at some point) he had told them to call Brook. When asked whether he told the children that Brook was trying to contact them between 5 p.m. and 6 p.m., he responded, "[t]hey were out playing with

5

their friends." At no point did he tell the kids to come in and talk to their mother when Brook was calling his phone from 5 p.m. to 6 p.m.

¶ 15       Thereafter, Brook made seven additional phone calls to Reginald's phone from 5:51 p.m. to 6:42 p.m., but no one answered. Reginald testified that his phone had continued to ring for a period of time after the 5:49 p.m. phone call. Brook testified that usually Reginald would answer the phone or give his phone to the children to speak with her. According to Jean, Reginald was in and out of the pole barn for those last seven phone calls, during which time his phone was in the pole barn with her. Although Jean had made Reginald aware that Brook was calling, Reginald did not answer or return Brook's calls. Reginald acknowledged that there was a timeframe during which Brook could call the children.

¶ 16       During her testimony, Jean admitted that, thereafter, from 9:00 p.m. to 10:42 p.m., she sent 27 text messages to Brook's cellphone, made multiple phone calls to Brook's cellphone, and left Brook multiple voicemail messages, which she did from her own phone (not Reginald's phone). Jean had consumed alcohol prior to doing so and was in the pole barn outside of her home when doing so. At the time Jean made the phone calls and sent the voicemail and text messages, Reginald was in and out of the pole barn. Reginald and Jean both testified that the minors were not in the pole barn when Jean was leaving the messages for Brook and that the minors were in the house at the time.

¶ 17       The text messages were entered into evidence by Brook. The text messages from Jean to Brook were as follows.

¶ 18       At 9:00 p.m.:

> "You do know I have you [sic] kids more than you do, right?? [Emoji] some day they will know you are a whore. Who would have thought they would have been living

with me when I told you that 4 years ago? You do know that I am going to tell them what a piece of shot [sic] you are, right ????? J.C. [Brook and Reginald's oldest son] is first and he will read all the paper work."

¶ 19     At 9:01 p.m.:

"Shit not shot lol. Typo"

¶ 20     At 9:02 p.m.:

"You do know that NOW they are with me more than their own mother, right [?] [Emoji]"

¶ 21     At 9:03 p.m.:

"Maybe you should work normal hours hahahahahaha."

¶ 22     At 9:04 p.m.:

"Your 'friends' and I are good friends. They know what a mental illness person you are and have tried to get you help but you are too mental to get it[.]"

¶ 23     At 9:08 p.m.:

"Your kids know you are mental as well. So so sad. Any [*sic*] who accepts with being with a gay guy is fucked up. That's when I filed for divorce. When I had proof her [sic] was definitely gay. You are stupid and pathetic.

I will make sure EVERYONE at the ball parks know about him. I have the proof and will hand it out."

¶ 24     At 9:11 p.m.:

"And I know a lot of people at Mary's ER and I have filled them [*sic*] about the whore you are. We all know that you are a Morris whore. And now you are gonna be a [S]t. Mary's whore. We all talk about you[.]"

7

¶ 25       At 9:12 p.m.:

"Good luck whore[.]"

¶ 26       At 9:22 p.m.:

"You ever come on my property I will have you arrested for trespassing. The farthest you will come on this property is the end of the driveway. Anything farther and I will cal[l] the cops. I have cameras everywhere. I now have proof that you have been told."

¶ 27       At 9:31 p.m.:

"You know who this is bitch[.]"

¶ 28       At 9:31 p.m.:

"Quit playing games[.]"

¶ 29       At 9:32 p.m.:

"All your children have friends over and [are] having a blast. Does you [*sic*] Cracker Jack box accommodate lots of friends whore??"

¶ 30       At 9:37 p.m.:

"Call me and ask who is this [emojis] you know exactly who this is"

¶ 31       At 9:39 p.m.:

"Keep fucking with me bitch. You will regret it. I have the paperwork and I will hand it out. Everyone already knows you are fucking a gay guy. You are pathetic don't everyone knows it. I have lots of friends and I know lots of people."

¶ 32       At 9:45 p.m.:

"You are pathetic. Good luck at [S]t. Mary's bitch. I know them all. I worked there bitch. I have lots of friends. They will all know what a whore you are."

¶ 33    At 9:49 p.m.:

"No one likes you. From [R]iverside to Morris to [S]t. Mary's. Oh and Palos. Oh and how long did it take you to get a 2 year degree you dumb shit?? You are stupid. Same as your gay boyfriend who I got his degree for him. Ask him. He knows it and admitted it to me.

I am friends with Deanna. I have learned lots [emoji]. You are a mental piece of shit and best part is your kids live with me!! Love it!!!"

¶ 34    At 9:56 p.m.:

"Remember the day I confronted you at the last football game ?? Scared pussy. Still scared. Flaunt your big ass and I will beat you every time. I am far skinnier and prettier then [sic] you will ever be you big nosed big assed bitch that you are[.]"

¶ 35    At 9:58 p.m.:

"Is your gay boyfriend working tonight?? Did he buy you a strap on yet?"

¶ 36    At 10:11 p.m.:

"I pray to God your daughter doesn't get your fat ass thighs but there are chubby chaser as you and I both know [Emoji] and gay guys that pretend[.]"

¶ 37    At 10:13 p.m.:

"Do you want your daughter to be with a guy that takes it up the ass with guys???? And if you at [sic] okay with that shame in [sic] you[.]"

¶ 38    At 10:13 p.m.:

"Are and on." (Presumably, corrections to the previous text)

9

¶ 39     At 10:17 p.m.:

"And bitch I know you are [*sic*] all these texts[.]"

¶ 40     At 10:17 p.m.:

"See[ing]." (Presumably, a correction to the previous text)

¶ 41     At 10:19 pm.:

"Again why do you think I walked away with everything?! Oh wait…you are stupid."

¶ 42     At 10:28 p.m.:

"Whore"

¶ 43     At 10:36 p.m.:

"I know you see these texts!! [T]hese kids are awesome I will say that!!! I am having a great time with them[.]"

¶ 44     At 10:42 p.m.:

"The best part is that Reggi offered you 40k 4 years ago and shared parenting and 4 years later it is 45k and shared parenting and lots of lawyer bills you dumb ass. How much do you really get?"

¶ 45     In testifying in relation to the 9:00 p.m. text to Brook, Jean could not say what paperwork she was referencing for sure. The paperwork she was referencing was either divorce paperwork or paperwork that indicated Jean had proof that "[name] is gay." (It appears Jean was referring to her ex-husband, who is now Brook's current paramour (referred to hereinafter as Brook's paramour)). Jean indicated there was "divorce paperwork," which was "up to" Reginald to share with J.C. When asked whether she also sent text messages indicating that she was going to make sure everyone at the ballparks (where the minors frequented) knew about Brook's paramour, Jean responded, "I'd have to see that to see about the ballparks." Jean acknowledged sending

10

texts to Brook indicating that Brook could not come on her property and if Brook did so, Jean would have Brook arrested for trespassing. She testified that she had indicated Brook would have to drop off and pick up the minors at the end of her driveway (which is how the pickup and drop offs for the children is currently done).

¶ 46    The evidence also indicated that at 9:30 p.m., Brook called Jean's phone number (after receiving multiple initial phones calls from Jean's phone number). Brook testified that on the night of May 1, 2021, she did not have Jean's name saved in her contacts on her phone, her phone was "ringing and ringing and ringing," and it was "just a phone number." At that point Jean had not yet left Brook any voicemail messages. Brook testified that around 9:30 p.m., she stepped outside of her work, called back the number, and asked "who is this?" She recognized Jean's voice when Jean said, "you know who the fuck this is." (Jean testified she had stated, "you know who this is"). Brook did not speak to Jean any further. Brook testified that at the time of the phone calls, voicemails, and text messages, she was at work "trying to run a very busy ER." Brook testified that at some point prior to Jean leaving a voicemail referencing Brook's boss having had called Jean, Brook's secretary had answered a call from Jean on Brook's phone and said, "this is my charge nurse's phone could you please stop calling."

¶ 47    From 9:42 p.m. to 10:22 p.m., Jean left six voicemail messages for Brook, knowing that Brook was at work at the time. The voicemails were played for the trial court from Brook's cellphone but were not transcribed, were not entered into the trial court record, and are not part of the record on appeal. The trial court indicated that the voicemails "will be admitted." The trial court further indicated to Brook's attorney, "if you wanted it as part of the court record you're gonna have to provide it in some sort of a memory device and you'll have to make sure that

11

[Jean's counsel] gets to review that before it's presented to the court." Brook's attorney responded, "Yes, sir. Absolutely."

¶ 48      The testimony of the parties indicated the following in relation to the voicemails Jean left for Brook. At 9:42 p.m., Jean indicated that she knew Brook's supervisor. Jean testified that she did not, in fact, know Brook's supervisor personally but that she knew who Jean's supervisor was. The reason Jean had indicated to Brook that she knew Brook's supervisor(s) was "[a]nger, upset." Jean did not view telling Brook that she knew her boss as a threat and testified that she had not done so to threaten Brook's job. Jean testified she had indicated in the message that referenced person(s) "know who you are" but the person(s) was/were not Brook's boss. Jean acknowledged leaving a voicemail message for Brook at 10:02 p.m., and testified that the minors were not present when she did so. In reference to the voicemail message left at 10:05 p.m., Jean acknowledged that she had threatened to pass out some "paperwork." Jean testified that the paperwork she was referencing in the voicemail was "proof from [her] device that [Brook's paramour] was having an affair with a gay alleged child enticer." Jean testified that she was not actually going to pass out the paperwork anywhere. Jean testified that she had "made a comment" (about the paperwork), but she did not "act on it" nor was she "acting on it." At 10:15 p.m., Jean left a voicemail for Brook, in which she had stated, "oh, you're at work." Jean left a final voicemail for Brook at 10:22 p.m. Jean acknowledged that in the voicemails, she had threatened that "someday" she would tell the kids that Brook (their mother) "is a whore." Jean also acknowledged that she threatened to tell the kids that "[Brook's paramour] takes it up the ass."

¶ 49      Brook testified that at the 1:45 minute mark of the 10:02 p.m. voicemail, in the background, "[c]lear as day," she heard her son (M.C.) yell her daughter's name (A.C.). Brook

12

did not know whether M.C. had heard Jean leaving the voicemail or where any of the children were when Jean was doing so. Brook testified that upon receiving the messages from Jean, she felt "[a]bsolutely like [Jean] was threatening [her] job, [her] children, [and] telling [her] children inappropriate things." Brook testified, "[t]hreatening to pass out things to their ballparks and to their coaches, that to me is threatening." Brook also testified that her manager at the hospital had informed her that a nurse had reported being contacted by Jean. When asked whether there had been any adverse action at her place of employment, Brook indicated "[n]ot at this point," but she had just started that job. When asked whether there had been any adverse action with the kids, Brook responded, "I think they've gone through a lot going through all that." Brook agreed the minors had been through a lot "going through four years of divorce."

¶ 50        Brook testified that she felt that she needed protection from Jean because Brook had to have a job and had to protect her children. Brook indicated that she did not need "ruffled feathers" at her new job. Brook testified that even before she had started her new job there had been a message that went to her new boss about her. She further testified that her children needed to be protected because "those are things that they should never hear about their mother or the man that lives in our home with us." She also indicated that the children did not need to read divorce papers unless they chose to do so as adults. Brook did not feel it was safe for the children to be around when the threatening voicemails and all the text messages were sent, regardless of whether they were "right there and heard it" or were walking by when it happened. She contended that the voicemail messages "were loud" and stated, "[w]e all heard them, they're loud." Brook asked the trial court to enter a plenary order of protection that included herself as well as her children.

¶ 51    Both Jean and Brook testified that, to their knowledge, the children had not seen Jean's texts. Brook testified that J.C. had asked what had happened multiple times and mentioned multiple things about "the night [Jean] was drinking and texting." J.C. never indicated to Brook that he had seen the texts from that night. He was, however, present when Jean was served with the summons (in this case). Brook testified that other than what transpired on May 1, 2021, she did not think the children have been around or witnessed any other problems with their safety. Brook testified that there had been no other indications that Jean caused any harm to the children.

¶ 52    On May 3, 2021, Brook attended a baseball game for one of the minors. Jean and Reginald were also present at the game. When asked if she had any fear at that point, Brook testified, "I was not afraid for my life, no." Brook did not feel as if she was in physical danger at that time. However, Brook was still concerned about the threats Jean had made on the voicemails.

¶ 53    Brook testified that she had concerns about what Jean may do without the stalking no contact order being extended. Brook stated that she was afraid Jean would pass out paperwork at the baseball games and, "the fact that [Jean said] that [she] was going to tell [Brook's] children these things, things that children do not need to hear" worried her. Brook testified that the repeated voicemails that Jean had left for her caused her distress and the phone calls from Jean had distressed her. She indicated that if Jean were to continue to send those types of messages or make those types of phone calls to her, it would cause her further distress.

¶ 54    Jean testified that prior to May 1, 2021, she had at no time ever spoken with anyone about Brook's employment, had never threatened Brook's employment, and never intended to threaten Brook's employment. She had also never spoken with the children about or showed

14

them any documents about Brook, Brook's paramour, or sexual information. Jean acknowledged the statements that she made on May 1, 2021, were inappropriate. She had no intention of talking to or threatening Brook's employment. She had never spoken with the children about Brook, Brook's paramour, or Reginald, and it was not her intention to ever do so.

¶ 55        Jean testified that what had gotten her "going" on the night of May 1, 2021, was "[Brook's] 12 phone calls and four years of anger." Jean stated that she had let the anger get the best of her "over 12 phone calls in a row." Jean had no intention of ever directly contacting Brook again. Jean testified that she had made bad choices and that she loved Reginald's children as much as she loved her own children and grandchildren. Jean testified that she has been there for the children, helped them, and "would never harm them ever." Jean testified that Reginald and Brook have done a great job parenting the children, indicating that they are happy, loving children. Jean testified, "I was very angry and I said things in anger." She became angry with Brook that night because "[r]epeated phone calls and four years of living hell."

¶ 56        Jean also testified that prior to May 1, 2021, Jean had never done anything similar and had never lashed out against Brook. She acknowledged that she had been aware that Reginald disseminated "these documents" to the children's "little league" and had not done anything about it (*i.e.*, she did not leave Reginald or take any action).

¶ 57        Jean further testified that she has had to separate herself from her home and Reginald since the entry of the stalking no contact order. She stated, "I would never make the children leave their home. They've been through enough." She indicated that she was asking for the order not be extended.

¶ 58        In their arguments, the parties' attorneys referenced the fact that Brook and Reginald's four-year divorce proceedings had been contentious. Brook's attorney noted that Reginald had

previously disseminated information similar to the information that Jean threatened to disseminate (presumably about Brook's paramour). Brook's attorney also argued that Jean had insinuated she was going to do something to cause Brook to lose her job and had threatened to tell the kids that Brook was a "fucking whore." Brook's attorney argued the children were either present or within earshot of Jean when she left the voicemail messages. He also argued that Jean had threatened to tell the children certain things and made threats that were adverse to the welfare of the children. Brook's attorney acknowledged that "stalking no contact requires more than one incident" and stated, "I know that's what [Jean's attorney] was getting at when we discussed, you know anything prior to May 1st." Brook's attorney argued that each voicemail was a separate incident, contending that every time Jean called and left a voicemail and every time she sent a text message, it was a new incident of harassment.

¶ 59 In response, Jean's attorney argued that there was "no evidence whatsoever of harm or even actual threat to harm to the children" or that minors have been or will be harmed by residing with Jean (during Reginald's parenting time). He also contended there was no evidence the minors had been present during the time of Jean's conduct at issue. He further asked the trial court to deny the extension of the plenary order because "[t]his [was] a one-time event."

¶ 60 In reply, Brook's attorney argued that with the anger that Jean and Reginald had resulting from Brook and Reginald's divorce proceedings, which included seven orders of protections (one between Brook and Jean), it was just a matter of time before "these kids were going to have everything dumped on them and be put into even more harm than what they've already gone through, and *** somebody actually gets Brook fired from a job." Brook's attorney also contended Jean's conduct included threats involving the children.

¶ 61 D. Trial Court's Ruling

16

¶ 62        In ruling, the trial court stated that it did not give any weight to Brook and Reginald's prior divorce proceedings, finding those were "irrelevant." The trial court found Jean's "threats to the children [were] reprehensible" and indicated it was not going to wait for Jean to make good on her threats to discuss information with Brook's employer or to make good on her threats regarding the children. The trial court indicated there was a "possibility of additional harm" to the children, noting the "significant harm" the children had already been exposed to due to "the problematic relationship of their parents." The trial court stated, "we are not going to have the children exposed to additional harm if this court can avoid that." The trial court indicated that it was, "for that reason," granting the stalking no contact extension for two years. The trial court further indicated it was not going to take the chance of Jean having another "drinking incident" and following through on "these threats." The trial court found that Jean had made "these threats to the children with disclosing this information" and indicated that it was not going to wait for "that information" to get put in front of the children."

¶ 63        The trial court entered a plenary stalking no contact order in favor of Brook and against Jean, with Brook's three children listed as "other protected parties." On the form order, a box was also checked indicating "filing on behalf of a minor child," but the names of the minors were not listed in the space provided. Under the "petitioner information" section, the minors were listed as "[o]ther protected persons (person to be included in the Stalking No Contact Order), in addition to the Petitioner." The form order also had a check in a box indicating that the trial court found that "the petitioner" was a victim of two or more acts of "following, monitoring, observing, surveilling, threatening, communicating, or inferring [*sic*] or damaging to property or pets by Respondent." A check was also marked in a box indicating that the trial court found the "victim" was unable to bring the petition on his or her own behalf "due to age, health, disability,

17

or inaccessibility," citing to section "15(b)" of the Act, presumably in reference to section 15(2) of the Act. See 740 ILCS 21/15(2) (West 2020) ("[a] petition for a stalking no contact order may be filed *** by a person on behalf of a minor child or an adult who is a victim of stalking but, because of age, disability, health, or inaccessibility, cannot file the petition"). The order prohibited Jean from threatening to commit or committing stalking, enjoined Jean from contacting Brook or the minors in any way, and ordered that Jean stay at least 500 feet away from them and their residence, schools, and place of employment.

¶ 64        Jean filed a motion to reconsider, arguing that the minors had lived with her for the past year and the trial court's order essentially terminated her relationship with the minors without allowing the minors the chance for a transition and without consideration of the effect the order would have on the well-being of the minors. Jean argued the children had already suffered traumatic events as the result of their parents' divorce and that severing their relationship with her "enhances the traumatic effects of the divorce." Jean argued the trial court entered the order based on its consideration there "might be" harm to the children resulting from future action by Jean, but there had been no evidence that the minors heard, or were in any way involved in, any of the alleged events. Jean contended that the trial court being concerned about the possibility of injury in the future, "ignores the fact of the very substantial injury caused to the children as a result of the effect of the Court's order." Jean, therefore, requested that the trial court reconsider its order and terminate the provisions of the plenary order restricting her from contact with the children.

¶ 65        The trial court acknowledged that there had been no evidence that Jean's actions took place in the presence of the minors. The trial court stated, however, that the repeated threats that were made and the audio (voicemails) were something it could not remove as a significant

18

potential danger to the children. The trial court stated, "I cannot risk her following through on the appalling threats that she made." The trial court found that no new evidence had been presented and there was no issue raised of the trial court misapplying the law and denied Jean's motion to reconsider.

¶ 66       Jean appealed.

¶ 67                                    II. ANALYSIS

¶ 68       On appeal, Jean argues that the trial court erred in entering the plenary stalking no contact order where it failed to identify the two or more acts necessary to establish a "course of conduct" as required under the Stalking No Contact Order Act. Jean, alternatively, argues that the Act did not intend for a single two-hour isolated incident to satisfy the requirements of the Act. Jean further contends that even if two or more such acts were present in this case in relation to Brook, there was no evidence as to any such conduct as it relates to the minors and any such finding was against the manifest weight of the evidence. Finally, Jean argues the order entered was not in the best interest of the minors because it deprives them of an important parental figure and adversely affects the parenting time with their father. Jean, therefore, requests that this court reverse the order of the trial court and vacate the stalking no contact order. In response, Brook argues that Jean did not raise her argument of a failure to establish a course of conduct in the trial court, forfeiting the issue. Alternatively, Brook argues the trial court did not err in finding Jean engaged in multiple separate acts to support the entry of the plenary stalking no contact order.

¶ 69       Under the Act, a victim of stalking may seek a civil remedy of a trial court ordering the stalker to stay away from him or her. See 740 ILCS 21/5 (West 2020); *Piester v. Escobar*, 2015 IL App (3d) 140457, ¶ 11. Under the Act, "stalking" is defined as "engaging in a course of conduct directed at a specific person, and he or she knows or should know that this course of

19

conduct would cause a reasonable person to fear for his or her safety, *** the safety of a third person[,] or suffer emotional distress." 740 ILCS 21/10 (West 2020); *Piester*, 2015 IL App (3d) 140457, ¶ 11.

¶ 70   A "course of conduct" is defined under the Act as two or more acts, "including but not limited to acts in which a respondent directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, or threatens a person, workplace, school, or place of worship, *engages in other contact*, or interferes with or damages a person's property or pet" and may include contact via electronic communications. (Emphasis added.) 740 ILCS 21/10 (West 2020); *Piester*, 2015 IL App (3d) 140457, ¶ 11. "In addition to surveillance, examples of stalking include appearing at the person's home and sending unwanted emails or electronic communications." *McNally v. Bredemann*, 2015 IL App (1st) 134048, ¶ 10 (citing 740 ILCS 21/5 (West 2012)).

¶ 71   Under the Act, "contact" is defined as including "any contact" with the victim that is "initiated or continued without the victim's consent, or that is in disregard of the victim's expressed desire that the contact be avoided or discontinued." 740 ILCS 21/10 (West 2020); *Piester*, 2015 IL App (3d) 140457, ¶ 11. "Reasonable person" is defined under the Act as "a person in the petitioner's circumstances with the petitioner's knowledge of the respondent and the respondent's prior acts." 740 ILCS 21/10 (West 2020). "Emotional distress" is defined under the Act as "significant mental suffering, anxiety or alarm." *Id*.

¶ 72   To obtain a plenary stalking no contact order, the petitioner must prove stalking by a preponderance of the evidence. 740 ILCS 21/30 (West 2020); *Piester*, 2015 IL App (3d) 140457, ¶ 12. A stalking no contact order will not be reversed unless it is against the manifest weight of the evidence. *Piester*, 2015 IL App (3d) 140457, ¶ 12. A finding is against the manifest weight of

20

the evidence if it is clearly apparent the opposite conclusion should have been reached or the finding is unreasonable, arbitrary, or not based upon the evidence presented. *McNally*, 2015 IL App (1st) 134048, ¶ 12

¶ 73    As an initial matter, our review of the record indicates that the issue of whether there had been two or more acts necessary to establish a course of conduct was properly raised in the trial court. Under the Act, Brook was required to prove that Jean had engaged in conduct that constituted stalking, with "stalking" defined, in part, as the respondent "engaging in a course of conduct," which, by definition, required a finding of two or more acts. See 740 ILCS 21/10 (West 2020); *Piester*, 2015 IL App (3d) 140457, ¶ 11. In the trial court, Brook's attorney acknowledged that Jean's attorney "was getting at" the requirement of more than one act when discussing "anything prior to May 1st." Brook's attorney also argued that each voicemail was a separate act, and Jean's attorney argued that this was "a one-time event." Therefore, Jean did not forfeit the issue of whether her alleged conduct consisted of two or more acts to constitute a course of conduct.

¶ 74    Turning to the issue on appeal, Jean argues that to be entitled to a stalking no contact order a petitioner must be stalked for more than "a single incident of under two hours." Jean contends that her conduct at issue consisted of phone calls, text messages, and voicemail messages over a period of less than two hours on May 1, 2021, which she argues constituted a single act and was not sufficient to establish a course of conduct. She argues that each phone call and message was not a separate "contact."

¶ 75    "Stalking generally refers to a course of conduct, not a single act." 740 ILCS 21/5 (West 2020). A "course of conduct" includes any contact with the victim initiated or continued without the victim's consent or in disregard of the victim's expressed desire that the contact be avoided

21

or discontinued. 740 ILCS 21/10 (West 2020). Examples of stalking behavior include "making unwanted phone calls, sending unwanted emails, unwanted messages via social media, or text messages." 740 ILCS 21/5 (West 2020). While the stalker's contact must be nonconsensual, a victim does not need to contact his or her stalker to inform the stalker the contact is unwanted. *Piester*, 2015 IL App (3d) 140457, ¶ 12. "The focus is on whether the stalker's behavior would cause a reasonable person to be fearful for her safety or to suffer emotional distress." *Piester*, 2015 IL App (3d) 140457, ¶ 12 (citing *McNally*, 2015 IL App (1st) 134048, ¶10); 740 ILCS 21/5 (West 2020) ("[v]ictims [of stalking] experience fear for their safety, fear for the safety of others and suffer emotional distress").

¶ 76 We note that "the Act narrowly restricts only the act of stalking, *i.e.*, following, monitoring, observing, surveilling, or interfering with a person, and does not seek to regulate speech." *Nicholson v. Wilson*, 2013 IL App (3d) 110517, ¶ 20. "[T]he only speech that is prohibited by the Act are threats of violence or intimidation, which are not constitutionally protected." *Id*. A party's exercise of free speech is excluded from the stalking statute. 740 ILCS 21/10 (West 2020) ("[s]talking does not include an exercise of the right to free speech or assembly that is otherwise lawful").

¶ 77 After reviewing the record in this case, we conclude that the trial court did not err by granting Brook's request for a two-year plenary stalking no contact order against Jean in regard to Brook. We note that Jean has failed to provide a complete record on appeal. The record on appeal does not include a recording or transcript of the voicemail messages and there is no bystander's report or agreed statement of facts in relation to those messages. See *Piester*, 2015 IL App (3d) 140457, ¶ 13 (citing *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (appellant has the burden to provide a complete record on appeal)). In the absence of a complete record, we

22

will resolve any doubts that arise from the incompleteness of the record against the appellant. *Foutch*, 99 Ill. 2d at 392. Thus, without a transcript of the voicemail messages, "we presume the trial court's determination had a factual basis and was in conformance with the law." See *Piester*, 2015 IL App (3d) 140457, ¶ 13 (citing *Foutch*, 99 Ill. 2d at 391-92).

¶ 78 Additionally, the record presented on appeal supports the trial court's finding in relation to Brook. Over the period of 1 hour and 42 minutes, Jean called Brook's cellphone numerous times, sent her 27 text messages, and left her 6 voicemail messages. At least two of the text messages, which are included in the record on appeal, can reasonably be said to have contained threats of violence or intimidation. Even if not in the text messages alone, we can presume at least two of the text messages and voicemail messages, in combination, did so. See *id.* Consequently, the trial court's finding that Jean had engaged in course of conduct was not against the manifest weight of the evidence.

¶ 79 We find no merit to Jean's contentions that a "course of conduct" cannot be established under the Act where the acts took place over the course of approximately two hours or that the totality of her actions on May 1, 2021, constituted only "one contact." In construing a statute, the court's primary objective is to ascertain and give effect to the legislature's intent. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 41. The language of the statute is the best indicator of legislative intent and should be given its plain and ordinary meaning. *Id*. We review issues of statutory interpretation *de novo*. *People v. Jones*, 223 Ill. 2d 569, 580 (2006).

¶ 80 To constitute stalking under the Act, there must be a course of conduct, which consists of two or more acts directed at a specified person, and the stalker knows this course of conduct would cause a reasonable person to fear for his or her safety or suffer emotional distress. 740 ILCS 21/10 (West 2020). Nothing in the Act requires the passage of any amount of time between

23

"acts." See 740 ILCS 21/1 *et seq.* (West 2020); see also *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186, ¶ 24 ("[w]hen the statutory language is plain and unambiguous, we may not depart from the law's terms by reading into it exceptions, limitations, or conditions the legislature did not express, nor may we add provisions not found in the law").

¶ 81 We further note that even without a finding of two or more threats of violence or intimidation, the record supports a finding that Jean initiated or continued multiple contacts with Brook without Brook's consent or in disregard of Brook's expressed desire that the contact be avoided or discontinued. See 740 ILCS 21/10 (West 2020). The record on appeal shows that at 9:30 p.m., after Jean had called Brook's phone numerous times from her phone (which was an unknown number to Brook) and had sent nine text messages to Brook (although it is unclear whether Brook had read those texts at that point), Brook called Jean's number to ask who was calling. Jean responded with either, "you know who this is" or "you know who the fuck this is." Brook recognized Jean's voice and did not speak to Jean any further. Also, Brook's secretary had answered Brook's phone and asked Jean to stop calling. Thus, the record supports a finding that Jean's calls, voicemail messages, and text messages, thereafter, were unwanted. See 740 ILCS 21/5 (West 2020). Nonetheless, Jean sent 18 more text messages to Brook's phone and left Brook additional voicemail messages, thereby, establishing a "course of conduct." See 740 ILCS 21/10 (West 2020).

¶ 82 Additionally, the contents of Jean's messages and circumstances at the time those messages were sent support a finding that Jean knew that her course of conduct would cause a person in Brook's circumstances with Brook's knowledge of Jean and Jean's prior acts to "suffer 'emotional distress' [significant mental suffering, anxiety, or alarm]." See 740 ILCS 21/10 (West 2020). Jean was aware that Brook was at work at her new job during this time, presumably

24

knowing that Brook would be unable to promptly address any alarm that her messages would cause. Also, at that time, Brook's circumstances and her knowledge of Jean and Jean's prior acts included, among other things, the following: (1) Jean was the live-in paramour of Brook's ex-husband, Reginald, with whom Brook had experienced a contentious four-year divorce and with whom Brook's children lived during Reginald's parenting time; (2) on May 1, 2021, Jean called Brook from her own phone (an unknown number to Brook) rather than from Reginald's phone, with a barrage of phone calls and vulgar messages over the course of 1 hour and 42 minutes, during which time, Brook's children were staying in Jean's home during their father's parenting time; (3) just a few hours prior, Brook had tried to contact her children to no avail, regardless of her having court-ordered permitted phone contact with her children during that time, with Brook's calls having been blocked when she called the children's phones and intercepted by Jean and disregarded when she called the children via Reginald's phone; (4) Jean had previously contacted at least one person at Brook's new job; (5) Brook knew that Reginald had previously disseminated the "paperwork," and Jean indicated that she would do the same; and (6) there were seven prior orders of protection resulting from Brook and Reginald's divorce proceedings, one of which Brook had obtained against Jean for stalking and threatening.

¶ 83     We, therefore, conclude that the trial court's finding that Brook proved by a preponderance of the evidence that Jean engaged in a course of conduct directed at Brook, knowing that this course of conduct would cause a reasonable person to suffer emotional distress was not against manifest weight of the evidence. Thus, the trial court did not err in finding that Brook had been the victim of Jean's stalking. Consequently, we affirm the trial court's stalking no contact order against Jean regarding Brook. See 740 ILCS 21/80 (West 2020) ("[i]f the court finds that the petitioner has been a victim of stalking, a stalking no contact order shall issue").

25

¶ 84       However, we cannot conclude the same in relation to the minors. The Act provides, in pertinent part applicable to this case, that a petition for a stalking no contact order may be filed (when relief is not available under the Illinois Domestic Violence Act of 1986) by any person who is a victim of stalking or by a person on behalf of a minor child who is a victim of stalking but, because of age, cannot file the petition. 740 ILCS 21/15 (West 2020). Here, Jean's course of conduct was not directed at the minors and, thus, they were not the victims of Jean's stalking. See 740 ILCS 21/10 (West 2020) (stalking means engaging in a course of conduct directed at a specific person, and the stalker knows or should know that "this course of conduct would cause a reasonable person to fear for his or her safety, the safety of a workplace, school, or place of worship, or the safety of a third person or suffer emotional distress"). We acknowledge that in relation to the voicemails that were not made part of the record on appeal, we generally would "presume the trial court's determination had a factual basis and was in conformance with the law." See *Piester*, 2015 IL App (3d) 140457, ¶ 13. However, there was no indication that Jean engaged in stalking behavior toward the children, even in relation to the voicemail messages. The trial court's ruling in relation to the children was based upon Jean's threats "with disclosing information" to the children and not on a finding that they were victims of stalking. Thus, insofar as the trial court included the minors in its order based upon the children having been victims of Jean's stalking, the finding was against the manifest weight of the evidence.

¶ 85       Additionally, insofar as the stalking no contact order was entered for the minors as "third parties" (*i.e.*, other protected parties) in relation to Jean stalking Brook, the record does not support a finding that Jean's course of conduct toward Brook would cause a reasonable person to fear for the safety of the children. See 740 ILCS 21/10 (West 2020); see also 740 ILCS 21/5 (West 2020) (stalking "victims" experience fear for their safety, "fear for the safety of others,"

26

and emotional distress, and should be able to seek a civil remedy requiring the offenders to stay away from them and "third parties"). Instead, the evidence indicated that the minors lived with Jean during Reginald's parenting time without incident. There was no evidence of any negative incidents between Jean and the children. Although Brook was concerned about the potential emotional distress the minors would possibly suffer if Jean did, in fact, disclose certain information to them about Brook and/or her paramour, there is no indication that Brook feared for the children's safety. Brook testified that notwithstanding the incident of May 1, 2021, she did not think the children had been around or witnessed problems with their safety and there had been no indication that Jean had caused any harm to the children.

¶ 86       We, therefore, conclude that Brook failed to present sufficient evidence to support the inclusion of the minors in the stalking no contact order and the trial court's ruling to the contrary was against the manifest weight of the evidence. See *Piester*, 2015 IL App (3d) 140457, ¶ 12; *McNally*, 2015 IL App (1st) 134048, ¶ 12 (a trial court's finding is against the manifest weight of the evidence where the opposite conclusion is clearly apparent or if the court's finding is arbitrary, unreasonable, or not based on the evidence presented). Thus, we vacate the portion of the trial court's order including the children as other protect parties.

¶ 87                                    III. CONCLUSION

¶ 88       For the foregoing reasons, we affirm the judgment of the circuit court of Kankakee County in part and vacate in part.

Affirmed in part and vacated in part.

¶ 90       JUSTICE HOLDRIDGE, concurring in part and dissenting in part:

I agree with the majority that the circuit court's plenary stalking no contact order, as it relates to Brook, was not against the manifest weight of the evidence. However, I respectfully

disagree with the majority's finding that there was no evidence to support the inclusion of the minors in the order. I would affirm the court's order in its entirety.