**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 230110-U

Order filed November 14, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| CHERYL L. STEWART, | ) | Appeal from the Circuit Court |
| | ) | of the 13th Judicial Circuit, |
| Petitioner-Appellee, | ) | La Salle County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-23-0110 |
| | ) | Circuit No. 23-OP-26 |
| | ) | |
| SARA JEAN BUNCH DALTON, | ) | Honorable |
| | ) | Karen C. Eiten, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON delivered the judgment of the court.
Presiding Justice Holdridge and Justice Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  The circuit court had jurisdiction to issue a stalking no contact order. Issuance of the stalking no contact order was not against the manifest weight of the evidence.

¶ 2     Respondent-appellant, Sara Jean Bunch Dalton, appeals the La Salle County circuit court's issuance of a stalking no contact order. Respondent argues that the court did not have jurisdiction to issue the order. She further argues that the contact was mutual and that there was only one incident such that petitioner-appellee, Cheryl L. Stewart, failed to establish the requisite course of conduct to obtain a stalking no contact order. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            Petitioner filed a petition seeking a stalking no contact order against respondent pursuant to the Stalking No Contact Order Act (Act). 740 ILCS 21/1 *et seq.* (West 2022). The court granted an emergency order and the matter proceeded to a plenary order hearing. Prior to any testimony, the court reviewed surveillance video which was later admitted into evidence.

¶ 5            Respondent testified that she was in a store and saw petitioner. Respondent called petitioner's name and then asked something like "how is your rapist husband?" Respondent stated that petitioner showed no emotion. Petitioner's counsel asked respondent about the statement she gave police, wherein she stated that petitioner looked confused and shocked. Respondent clarified that petitioner had no reaction which she would say was shock. Petitioner walked away from respondent and respondent again made a statement to petitioner about petitioner's "rapist husband." Petitioner and respondent proceeded in opposite directions. Respondent proceeded toward the checkout area. She saw petitioner from a distance walking towards the front of the store. Respondent saw petitioner's cart unattended. Respondent walked to the self-checkout area and saw petitioner's "head over a display staring right at [her]." Respondent did not make another comment to petitioner until petitioner approached her. When petitioner re-approached respondent, she "took that as an open conversation engagement again." Petitioner was on the phone and did not speak to her. Respondent asked petitioner if she wanted to see the "photos of the case" and if she had seen them. Respondent testified that she may have asked petitioner if she knew why her husband was fired from the police department. Respondent heard petitioner telling the person she was on the phone with that respondent was getting ready to leave the store. Respondent thought petitioner was on the phone with her husband.

¶ 6        Respondent finished checking out and proceeded to the exit. Respondent testified that petitioner was blocking her path. Petitioner was accompanied by a security guard. Petitioner and the security guard narrowed the pathway to the exit so that the security guard needed to move in order for respondent to walk through. Respondent exited the store and then took out her phone to record petitioner. Respondent made a statement to the security guard that petitioner's husband was fired from the police department for being a rapist. When asked if the statement was made to the security guard, knowing petitioner was right there, respondent stated that the statement was made "to the vicinity." Respondent started recording because she was nervous as she was exiting the store and petitioner was telling the person she was on the phone with that she would follow respondent to her car. Respondent became vocal again and started recording, in the hope that petitioner would stop. The police arrived shortly thereafter. Respondent denied that the statements she made were intended to intimidate petitioner.

¶ 7        Respondent testified that when she made the statements to petitioner she was not yelling and her tone was conversational. She did not follow petitioner around the store. Between the first encounter with petitioner and the second encounter when she was walking toward the checkout area, she saw petitioner from a distance but did not say anything to her. The third time she saw petitioner was at the checkout area and petitioner approached her. Petitioner just stared at respondent and respondent felt intimidated. Petitioner never spoke to respondent.

¶ 8        Petitioner testified that she encountered respondent at the store. She heard respondent behind her "saying things of the nature of how did your husband like losing his job, are you still living with that rapist husband." When she turned around, she saw respondent several aisles behind her. Petitioner testified that she did not engage with respondent but instead turned around and walked away. Petitioner was panicked and wanted to get away. As petitioner walked away,

3

respondent continued to say things of the same nature. Petitioner testified that she called her husband and he advised her to call the police. She walked towards the checkout area. When she was getting closer to the checkout area but not yet at the registers, respondent again started making comments about petitioner living with a rapist and her husband being fired. Petitioner testified that she walked away from her cart in an effort to get away and that respondent started asking petitioner where she was going and why she was leaving her cart. When petitioner left her cart, she called the police. She walked to the area where the carts were located near the self-checkout area and leaned against them while talking to the police. Respondent was at the self-checkout area. Petitioner did not speak with respondent. Petitioner testified that the police asked her if the store had security and so she approached a cashier to inquire about a security guard. The cashier directed petitioner to the security guard and petitioner contacted the security guard between the front door and the cart corral. Petitioner testified that respondent finished checking out and left the store and was in close proximity to petitioner and the security guard as she left. The police asked if petitioner could see what car respondent was getting into, so she went outside to see. As soon as petitioner exited the store, respondent turned her phone and camera on her and stated loudly that petitioner's husband is a rapist and was fired from the police department. Petitioner testified that she asked the security guard to see what vehicle respondent was getting into. Respondent proceeded to her vehicle and the police arrived shortly thereafter. Petitioner stated that the incidents at the store made petitioner's heart race and her palms sweaty, and she just wanted to get out of the situation and for respondent to leave her alone. Petitioner was asked how she felt since the incident and she stated, "[i]t keeps [her] up at night." She was nervous to come to court but felt she needed an order so respondent would leave her alone. Petitioner testified that she gets nervous going to stores because she doesn't know who is going to be there.

¶ 9        On cross-examination, petitioner admitted that surveillance video showed her walking toward respondent when respondent was at the self-checkout area. Petitioner stated that she did so because she was on the phone with the police and was looking for something to lean on while she waited for further directions. Petitioner testified that she stayed close to respondent because she did not know where else to go and she had already left her cart. She did not want to walk back to her cart. Petitioner was in a panicked, shocked state and was just waiting for the police to tell her what to do. Petitioner testified that she did not feel fearful exiting the store to follow respondent because the security guard was there and she was doing what the police told her to do. Petitioner acknowledged that respondent did not tell petitioner that she was going to harm her. Petitioner sought the no contact order on the basis that she did not like what respondent said to her.

¶ 10        Surveillance video showed petitioner stop with her cart near, but not at, the checkout area. A few seconds later, she walked away from the cart towards the front of the store. Respondent appeared as petitioner walked away from her cart. Respondent walked to the self-checkout area. Petitioner moved closer to the self-checkout area. The video showed that there was a row of carts between petitioner and the backside of the self-checkout area. Petitioner appeared to be on the phone. Petitioner then walked away and eventually approached the security guard. She followed the security guard toward the cart corral. Respondent walked by petitioner and the security guard and exited the store. Petitioner and the security guard were not blocking respondent's path but the security guard took a step away as respondent walked past. The video showed that petitioner began walking out after respondent but stopped and turned around until the security guard exited with her. As they walked out the door, respondent turned around and held her phone up, apparently recording petitioner.

5

¶ 11    The court noted that it had heard all the testimony and had an opportunity to observe the parties as they testified. The court found that respondent's intention "could only have been to upset" petitioner and "[t]here was no other intention ascribed to that." The court determined there were at least two encounters and believed there were four. Respondent admitted in her statement to the police that she spoke to petitioner several times. The court noted there was no testimony that petitioner engaged respondent. The court found there were two or more acts, as required under the Act. Therefore, the court entered the stalking no contact order. Respondent appeals.

¶ 12                                    II. ANALYSIS

¶ 13    Respondent argues that the circuit court lacked jurisdiction to issue the stalking no contact order, and it is therefore void. Respondent contends that the stalking no contact order was not in compliance with the Act, as the order was based on a single incident, involved free speech and petitioner was a " 'mutual' player." However, the issue of whether the order complied with the Act is not a jurisdictional issue. The circuit court had jurisdiction to enter the order in this matter because it has jurisdiction over all justiciable matters, except those which our supreme court has original and exclusive jurisdiction. See *McCormick v. Robertson*, 2015 IL 118230, ¶¶ 19-21. Moreover, the Act specifically states that "[e]ach of the circuit courts has the power to issue stalking no contact orders." 740 ILCS 21/45 (West 2022). Except in limited situations that are not present here, "the fact that the litigants or the court may have deviated from requirements established by the legislature does not operate to divest the court of jurisdiction." *McCormick*, 2015 IL 118230, ¶ 22.

¶ 14    Respondent also argues that the stalking no contact order should not have been issued because petitioner followed and stayed close to respondent such that she was a

6

" 'mutual' player." Respondent failed to cite to any legal authority supporting this argument as required by Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) (providing that argument must "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" and that "[p]oints not argued are forfeited"). As such, we conclude that respondent failed to properly develop and support her argument in this regard and therefore, those arguments are forfeited.

¶ 15     Respondent further argues that there was only one incident, as it involved one shopping trip at one location and that the Act does not apply to free speech. Under the Act, " '[s]talking' means engaging in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to fear for his or her safety *** or suffer emotional distress." 740 ILCS 21/10 (West 2022). " 'Course of conduct' means 2 or more acts, including but not limited to acts in which a respondent *** follows, monitors, observes, surveils, or threatens a person, *** engages in other contact, or interferes with or damages a person's property or pet." *Id.* § 10. "Nothing in the Act requires the passage of any amount of time between 'acts.' " *Coutant v. Durell*, 2021 IL App (3d) 210255, ¶ 80. " 'Contact' includes any contact with the victim, that is initiated or continued without the victim's consent, *** including *** approaching or confronting the victim in a public place." 740 ILCS 21/10 (West 2022). "A victim does not need to contact her stalker to inform him or her that the contact is unwanted." *Piester v. Escobar*, 2015 IL App (3d) 140457, ¶ 12. "The focus is on whether the stalker's behavior would cause a reasonable person to be fearful for her safety or to suffer emotional distress." *Id.* The court shall issue a stalking no contact order if it finds the petitioner has been a victim of stalking. 740 ILCS 21/80 (West 2022). The petitioner is required to prove stalking by a preponderance of the evidence. *Piester*, 2015 IL App (3d) 140457, ¶ 12.

The decision to issue a stalking no contact order will only be reversed if it is against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Nicholson v. Wilson*, 2013 IL App (3d) 110517, ¶ 22.

¶ 16     Here, the court found that there were two or more acts to constitute a course of conduct as required under the Act. We cannot say that this finding was against the manifest weight of the evidence. Specifically, the course of conduct includes nonconsensual contact, including approaching or confronting the victim in a public place. Here, the parties encountered each other in a public place, a store. The testimony indicates that there were multiple times that respondent confronted petitioner. Both parties testified as to the initial contact when respondent called petitioner's name and began making statements about her husband. Petitioner attempted to walk away, indicating the contact was unwanted, but respondent herself testified that she continued to confront petitioner by making statements about her husband. Petitioner testified that respondent again confronted her with statements about her husband, which made petitioner walk away from her cart and call the police. Respondent testified that she made statements to petitioner while respondent was at the self-checkout area, again confronting petitioner regarding her husband. She admitted that petitioner never spoke to her. Finally, respondent admitted that she recorded petitioner. As the court concluded in *Coutant*, the Act does not require any passage of time between acts. Thus, although the acts were in close proximity, they were distinct acts.

¶ 17     As to respondent's allegations that her conduct was protected by free speech, we note that this argument is largely undeveloped. See *e.g.*, *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993) ("A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may

8

foist the burden of argument and research."). Essentially, respondent asserts that free speech is not prohibited under the Act and cursing is not harassment, but fails to articulate how her conduct in confronting petitioner multiple times was protected free speech. See *Henby v. White*, 2016 IL App (5th) 140407, ¶ 26 ("When words are a component of the stalking behavior, then the speech does not fall within constitutional protections."). We note that respondent refers to the Rights of Crime Victims and Witnesses Act (725 ILCS 120/1 *et. seq.*) but fails to cite to any specific provision that would protect her conduct in this case or otherwise argue how it is applicable. Based on the foregoing, respondent has failed to show that her conduct was protected free speech.

¶ 18    The court's findings were obviously based on its observations of the parties, their testimony, and the court's assessment of their demeanor and credibility. We, as the reviewing court, defer to the trial court's assessment of demeanor and credibility, as the court directly observed such testimony in person, in open court. See *In re Marriage of Manker*, 375 Ill. App. 3d 465, 477 (2007) ("A reviewing court will defer to the trial court's findings because the trial court, 'by virtue of its ability to actually observe the conduct and demeanor of witnesses, is in the best position to assess their credibility.' ") (quoting *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 980 (2006)).

¶ 19                                III. CONCLUSION

¶ 20    The judgment of the circuit court of La Salle County is affirmed.

¶ 21    Affirmed.