# Illinois Official Reports

## Appellate Court

---

### *McNally v. Bredemann*, 2015 IL App (1st) 134048

---

| | |
|---|---|
| Appellate Court Caption | DEBORAH McNALLY, Petitioner-Appellee and Cross-Appellant, v. SCOTT BREDEMANN, Respondent-Appellant and Cross-Appellee. |
| District & No. | First District, Third Division<br>Docket No. 1-13-4048 |
| Filed | March 31, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-OP-73314; the Hon. Cynthia Ramirez, Judge, presiding. |
| Judgment | Appeal affirmed and cross-appeal dismissed. |
| Counsel on Appeal | Harry C. Lee, of Law Office of Harry C. Lee, of Chicago, for appellant.<br><br>Anthony J. Carballo and Garry L. White, both of Freeborn & Peters LLP, of Chicago, for appellee. |
| Panel | JUSTICE LAVIN delivered the judgment of the court with opinion.<br>Presiding Justice Pucinski and Justice Hyman concurred in the judgment and opinion. |

**OPINION**

¶ 1    After nearly five years of persistently being stalked in various forms including email, telephone, Internet posting and a personal visit at her home, Deborah McNally, a practicing psychologist, obtained a two-year "stalking no contact" order against her former patient, Scott Bredemann. After the order was entered, her attorneys filed a petition for payment of roughly $73,000 in fees for their professional time spent on the seemingly interminable proceedings. The trial judge awarded only $7,500, an amount that was apparently inspired by a proposed settlement between the parties that respondent rather purposely walked away from.

¶ 2    Bredemann appeals, contending that the Stalking No Contact Order Act (740 ILCS 21/1 *et seq.* (West 2012)) (the Act) does not apply to a patient trying to contact his therapist, that he did not know nor should he have known that McNally would fear for her safety, and that as a result the trial court's determination was against the manifest weight of the evidence. Additionally, he contends first amendment rights were violated. McNally also appeals, contending that her attorneys should be compensated in the amount requested and also that Bredemann should be sanctioned for filing a frivolous appeal that is cunningly designed to continue harassing his former therapist. We affirm the judgment against Bredemann and dismiss McNally's cross-appeal as it relates to the fee request, owing to a lack of jurisdiction. We deny McNally's motion for sanctions.

¶ 3                                    BACKGROUND

¶ 4    In May, 2002 Scott Bredemann was a troubled college student who sought therapy from Deborah McNally, a clinical psychologist with offices in a western suburb of Chicago. Over the course of that summer, McNally saw Bredemann a dozen times, without any noticeable issue or conflict. The main subject of the therapy, according to Bredemann, concerned his preoccupation with the thought that he was homosexual. Six years passed and Bredemann again made an appointment with McNally. The intervening years were clearly not kind to Bredemann's mental health, as he appeared highly irrational and delusional to his therapist, who saw him twice before coming to the conclusion that he needed to see a psychiatrist for a medication evaluation and told her patient that she would not see him until he was compliant with that treatment recommendation. Bredemann told McNally he would "consider" her recommendation, but promptly began to pester McNally with various forms of communication.

¶ 5    Over a period of nearly five years, Bredemann found various ways to attempt to resume contact with his therapist, who had clearly told him to cease all contact. He emailed her, using his own email account. Then he assumed various identities and emailed her, engaging her in a discussion of her therapeutic techniques, under the guise that he (or she, as he took both genders in his deception) wanted to be sure of what his proposed mental health provider could offer. A series of telephone calls that were all listed as "unknown" on McNally's telephone suddenly popped up out of nowhere. Bredemann also made various postings on the Internet that disparaged McNally's professional abilities. He also attempted to "friend" McNally on Facebook and also tried to do the same with her daughter. He inquired on the Internet for advice about hacking a Facebook account if someone refused to "friend" him. Ultimately, Bredemann somehow discovered where McNally lived and appeared on her doorstep, where

he rang her doorbell and spoke briefly to her husband, telling him that he needed to speak with Dr. McNally.

¶ 6 Bredemann's personal "visit" was unnerving enough to petitioner that she reached out to a professional psychology organization for advice on how to deal with the threat that she perceived from this ex-patient. An expert in the field informed McNally that Bredemann posed a *threat to her life* and that she should take immediate security steps to protect herself and her family. She was also advised to send a letter to Bredemann again instructing him to not contact her in any way. Finally, she was advised to obtain a court order of protection.

¶ 7 The trial court first entered an emergency "stalking no contact" order against Bredemann, who was then served with the order. McNally's attempts to obtain a "plenary" order that would last for two years were frustrated by various delays, most of which were attributable to conduct by respondent. After switching attorneys, Bredemann agreed to settle the controversy by paying $7,500 to pay attorney fees. He also agreed, verbally and on the record in a court hearing, to obtain mental health treatment and to never contact McNally, her family and an officemate in any way shape or form.

¶ 8 Within weeks, that settlement blew up when Bredemann refused to sign the release as drafted, while imposing a number of requirements that were previously never discussed and that were not agreeable to McNally. As a result, the matter ultimately went to a lengthy hearing. At the conclusion of the hearing, the trial court issued a blistering ruling that castigated respondent for not being a credible witness. The judge also noted that Bredemann only knew McNally because of their relationship as patient and therapist, that he had never known her as a private individual and that his attempts to contact her were of a private nature. His actions, according to the judge, were inconsistent with his claim that he wanted to "reinitiate a patient-therapist relationship." The trial judge thus entered a two-year order of protection in light of respondent's lengthy history of stalking his former therapist.

¶ 9                                                     ANALYSIS

¶ 10 Bredemann now challenges the no-contact, no-stalking order of protection against him under the Act (740 ILCS 21/1 *et seq.* (West 2012)). Recognizing that "[s]talking is a serious crime," the legislature passed the civil Act in 2010 to provide a remedy for victims who have safety fears or emotional distress as a result of stalking. 740 ILCS 21/5 (West 2012); Pub. Act 96-246 (eff. Jan. 1, 2010) (adding 740 ILCS 21/1 *et seq.*). Under the Act, stalking specifically means, "engaging in a course of conduct directed at a specific person," where the respondent "knows or should know that this course of conduct would cause a reasonable person to fear for his or her safety or the safety of a third person or suffer emotional distress." 740 ILCS 21/10 (West 2012). A "course of conduct" is "2 or more acts *** in which a respondent directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, threatens, or communicates to or about, a person, engages in other contact, or interferes with or damages a person's property or pet." *Id*. In addition to surveillance, examples of stalking include appearing at the person's home and sending unwanted emails or electronic communications. 740 ILCS 21/5 (West 2012). The term "contact" is "any contact with the victim, that is initiated or continued without the victim's consent, or that is in disregard of the victim's expressed desire that the contact be avoided or discontinued." 740 ILCS 21/10 (West 2012). When a victim seeks a protective order under the Act, she bears the

burden of proving by a preponderance of the evidence that the conduct constitutes stalking. 740 ILCS 21/30 (West 2012).

¶ 11    On appeal, Bredemann contends McNally failed to meet her burden because he did not know his conduct would cause McNally to fear for her safety or suffer emotional distress, nor was he aware the contact was unwelcome within the meaning of the Act. Bredemann reasons McNally did not "alert" him to that fact. Bredemann further characterizes his electronic communications, like the emails and Facebook "friend" requests, as innocuous conduct in a social media milieu.

¶ 12    A trial court's determination that a preponderance of the evidence shows a violation of the Act will not be overturned unless such a determination is against the manifest weight of the evidence. See *Nicholson v. Wilson*, 2013 IL App (3d) 110517, ¶ 22. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Id.*; see also *Harris Trust & Savings Bank v. Village of Barrington Hills*, 133 Ill. 2d 146, 156-57 (1989). This is not such a case.

¶ 13    Here, the evidence showed Bredemann sent repeated emails to McNally blaming her for robbing him of happiness and ruining him psychologically because of their therapist-client relationship, which ended six to eight years earlier. McNally testified she told respondent to cease communications as early as 2008, ordering him not to return unless he was medicated under psychiatric care, and the court specifically found her credible. Disregarding her wishes, from about 2008 to 2013, Bredemann created a minimum of 10 different aliases to reach McNally via email, criticize her on professional websites, and communicate with her family and friends. He also sent her personal emails in his own name. The court found Bredemann's pseudonymous subterfuge all the more ominous. With those efforts proving ineffective, Bredemann stepped out of the digital realm, appearing at McNally's private residence unannounced. As the trial court found, this was not innocent conduct of a well-meaning patient trying to sort out psychological issues in a professional therapeutic setting. Rather, these contacts were private in nature and contrary to the patient-therapist relationship. The conduct is just the sort of creepy, sinister and unsettling activity that the Act is designed to protect against.

¶ 14    Having reached this conclusion, we note the Act for obvious reasons does not require that a victim contact her stalker to communicate conduct is unwanted, as Bredemann suggests. See 740 ILCS 21/10 (West 2012). The Act's focus is properly on whether the stalker "knows or should know that this course of conduct would cause a *reasonable person* to fear for his or her safety or the safety of a third person or suffer emotional distress." (Emphasis added.) *Id*. The Act merely requires that the stalker's contact be nonconsensual. In this case, Bredemann himself admitted McNally did not wish to resume treatment until he saw a psychiatrist, and she never permitted him to contact her outside the professional setting. Indeed, to assume a therapist consented to her patient's private contacts would be an absurd inference, especially on this evidence. While Bredemann urges this court with precious little basis to find McNally incredible, we observe questions of witness credibility and conflicting evidence are matters for the trial judge to resolve as the trier of fact, and not this court. See *In re Marriage of Sturm*, 2012 IL App (4th) 110559, ¶ 6.

¶ 15    In that vein, we reject Bredemann's related argument that the Act did not apply to him because he was a patient attempting to contact his therapist. The application of the facts to the

law belies this argument, and the Act makes no such exception. Similarly, Bredemann's arguments that his conduct must rise to the level of "stalking" under the criminal statute in order to constitute "stalking" under the civil Act are unpersuasive.

¶ 16 In short, the record demonstrates and Bredemann admits to a multitude of contacts that would reasonably cause a person to fear for her safety or suffer emotional distress. McNally testified she did in fact suffer these things and changed her daily routine because of the harassment. At the same time, the record does not imply an innocent motive in Bredemann's conduct. Thus, the trial court's finding that Bredemann's course of conduct established a pattern of behavior that is stalking under the Act, thus warranting a plenary order of protection, was eminently reasonable. The opposite conclusion clearly was not warranted. See *Nicholson*, 2013 IL App (3d) 110517, ¶ 22.

¶ 17 In a similarly vacuous way, Bredemann next claims that his pseudonymous Internet postings were protected free speech. This court in *Nicholson*, 2013 IL App (3d) 110517, ¶ 20, already rejected arguments that the Act violates the right to free speech. That is, words surrounding surveiling, interfering, or harassing a person to intimidate are not constitutionally protected. *Id*. While stalking does contain an element of speech, that speech does not fall within the protections of the first amendment. *People v. Bailey*, 167 Ill. 2d 210, 227 (1995). Bredemann's Internet postings, under his various aliases, were a transparent part of his stalking conduct. For example, he intentionally made McNally aware that some pseudonymous postings were his own, as when he attached the name "Brian Hogan" to an email sent under his own name to McNally. "Where speech is an integral part of unlawful conduct, it has no constitutional protection." (Internal quotation marks omitted.) *Id*.

¶ 18 Bredemann next contends the trial court erred denying his motion to strike references to his mental health, including his communications to McNally in psychotherapy treatment from 2002 and 2008. Specifically, Bredemann claims such disclosures were prohibited by the Mental Health and Developmental Disabilities Confidentiality Act (740 ILCS 110/1 *et seq*. (West 2012)) (the Confidentiality Act). McNally counters, Bredemann forfeited this issue by failing to raise it before the trial court and in a posttrial motion. See *Calabrese v. Benitez*, 2015 IL App (3d) 130827, ¶ 17 (defining forfeiture). We agree, as Bredemann raised no such issue in his posttrial motion. Moreover, we would venture to say he positively waived any right to therapist-patient confidentiality by his menacing conduct. See, *e.g.*, *D.C. v. S.A.*, 178 Ill. 2d 551, 568-70 (1997) (noting the therapist-recipient privilege is not absolute and may yield to fundamental fairness or where the interests of justice demand that we tip the balance in favor of disclosure and truth).

¶ 19 Even putting forfeiture and waiver aside, we observe that the Confidentiality Act provides an exception to the general rule against disclosures, "when, and to the extent, a therapist, in his or her sole discretion, determines that disclosure is necessary to *** protect the recipient[1] or other person against a clear, imminent risk of serious physical or mental injury." 740 ILCS 110/11(ii) (West 2012). "[W]hen a therapist feels there is a threat of *imminent* risk to anyone, including the therapist, the therapist may disclose for the purpose of preventing or avoiding the injury." (Emphasis in original.) *People v. Gemeny*, 313 Ill. App. 3d 902, 910 (2000). Given that the complained-of disclosures were made in the context of hearings for a protective order

---

[1]A "recipient" is a person who is receiving or has received mental health services. 740 ILCS 110/2 (West 2012). A therapist includes a psychologist. *Id*.

under the Act, McNally in her discretion clearly determined disclosure was necessary to avoid injury. Therefore, it was not error for the trial court to decline to strike all references to matters pertaining to Bredemann's mental health, including the communications to McNally during and in connection with Bredemann's psychotherapy treatment in 2002 and 2008. Based on the foregoing, we affirm the judgment of the trial court.

¶ 20 We turn next to McNally's cross-appeal in which she challenges the trial court's award of $7,500 in attorney fees and costs as insufficient. Bredemann counters that her cross-appeal is untimely because McNally did not file her notice of appeal within 30 days of the court's order denying a proper postjudgment motion. Under Illinois Supreme Court Rule 303(a)(3) (eff. Jan. 1, 2015), a cross-appeal must be filed within 30 days from the judgment or order being appealed, or within 30 days from the order disposing of the last pending postjudgment motion.

¶ 21 The procedural facts in this case reveal the trial court entered the present protective order on December 3, 2013. Pursuant to the remedies under the Act, the court also awarded McNally $7,500 in costs, including attorney fees. See 740 ILCS 21/80(c) (West 2012). Several days later, McNally filed a separate attorney fees petition, which was denied after a hearing. The court and parties also agreed that Bredemann had paid McNally the $7,500 before trial as part of the proposed settlement agreement. On December 6, the court entered a corrected final order of protection. On December 24, Bredemann filed a "motion to compel execution of release of judgment" of $7,500. At the ensuing hearing, the court noted there was no "judgment" to release, as the charge was a statutory remedy, and regardless, they agreed it had already been paid. Accordingly, on December 30, the trial court entered an order denying Bredemann's motion to compel release of the judgment. On December 31, Bredemann timely filed his notice of appeal from the December 6 judgment. McNally then filed her notice of cross-appeal on January 28, 2014.

¶ 22 McNally characterizes Bredemann's motion to compel release as a proper postjudgment motion. She argues that from its denial on December 30, she had 30 days to file her notice of appeal under Rule 303(a)(3), and her cross-appeal was thus timely filed on January 28. We disagree. "A postjudgment motion extends the time for filing a notice of appeal *** only when it seeks rehearing, retrial, modification or vacation of the judgment, or other similar relief." *Heiden v. DNA Diagnostics Center, Inc.*, 396 Ill. App. 3d 135, 138 (2009), *appeal denied*, 236 Ill. 2d 504 (2010). In other words, the motion must be directed against the final judgment. *Id*. at 138-39. Generally, a motion to compel release of judgment, which does not attack or challenge the final judgment, does not constitute a postjudgment motion that will toll the time for filing a notice of appeal. *Moenning v. Union Pacific R.R. Co.*, 2012 IL App (1st) 101866, ¶¶ 34-35; see also 735 ILCS 5/2-1203(a) (West 2012) (governing postjudgment motions in nonjury cases).

¶ 23 Here, Bredemann's motion did not substantively challenge the final December 6 judgment. For the purposes of Rule 303, it did not constitute a postjudgment motion. McNally's cross-appeal was therefore untimely, because it was not filed within the required 30 days from the denial of a postjudgment motion or a final order. As such, this court is without jurisdiction to consider the substantive merits of McNally's cross-appeal.

¶ 24 McNally also asks this court to impose sanctions on Bredemann, claiming he filed a frivolous appeal. Under Illinois Supreme Court Rule 375(b) (eff. Feb. 1, 1994), we have the inherent jurisdiction to impose sanctions. *Sterling Homes, Ltd. v. Rasberry*, 325 Ill. App. 3d 703, 709 (2001). Thus, we are not bound by the jurisdictional strictures identified above and may address the matter *sua sponte*. Rule 375 provides sanctions for frivolous appeals that are

not taken in good faith. *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 87. For example, appeals that are intended to harass, or cause needless delay or litigation costs, are sanctionable against the party or his attorney. Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994). A reviewing court applies an objective standard to determine whether an appeal is frivolous, *i.e.*, if it would not have been brought in good faith by a reasonable, prudent attorney. *Korzen*, 2013 IL App (1st) 130380, ¶ 87. Nonetheless, the imposition of Rule 375 sanctions is left entirely to the discretion of the reviewing court. *Kheirkhahvash v. Baniassadi*, 407 Ill. App. 3d 171, 182 (2011).

¶ 25 We agree with McNally that there is precious little merit to this appeal, and in fact find that it is consistent with continuing harassment by Bredemann. At the same time, we recognize this case addresses a relatively new statute with only one published case interpreting it. See *Nicholson*, 2013 IL App (3d) 110517. For that reason, and in the exercise of our broad discretion, we choose not to impose sanctions. *Kheirkhahvash*, 407 Ill. App. 3d at 182. We leave it to McNally and the trial court to determine whether an extension of the order is warranted given the fact that this appeal has consumed a great portion of the two-year period granted below. See 740 ILCS 21/105(c) (West 2012) (noting plenary orders may be extended).

¶ 26                                      CONCLUSION

¶ 27 For the reasons set forth above, we affirm the judgment of the circuit court as to Bredemann's appeal. We dismiss McNally's cross-appeal for attorney fees. We deny McNally's request for Rule 375 sanctions, which we have considered *sua sponte*.

¶ 28 Appeal affirmed and cross-appeal dismissed.