2021 IL App (1st) 181540-U

FIRST DISTRICT,
FIRST DIVISION
December 20, 2021

No. 1-18-1540

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| MYRA LUEVANO, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Petitioner-Appellant, | ) ) | |
| v. | ) ) | No. 17 OP 78200 |
| JORGE HERNANDEZ, | ) ) ) | Honorable Rossana P. Fernandez, |
| Respondent-Appellee. | ) ) | Judge Presiding |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Hyman and Justice Walker concurred in the judgment.

**ORDER**

*Held*: The trial court's ruling denying petitioner a stalking no contact order was not against the manifest weight of the evidence.

Petitioner Myra Luevano filed a *pro se* petition for an emergency stalking no contact order against respondent Jorge Hernandez pursuant to the Stalking No Contact Order Act (Act) (740 ILCS 21/1 *et seq.* (West 2016)), which the trial court denied. After holding a hearing for a plenary order, the trial court granted Hernandez's motion for a directed finding and denied

Luevano's petition. On appeal, Luevano argues that the trial court's ruling was against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4        On November 27, 2017, Luevano filed a *pro se* petition for an emergency stalking no contact order against Hernandez, alleging that he was stalking her. The court denied her request for an emergency order and set the petition for a plenary hearing.

¶ 5        At the plenary hearing on June 18, 2018, Luevano testified that she did not have a relationship with Hernandez and the first time she saw him was at a restaurant in September 2007.[1] She was eating with her co-workers when she saw Hernandez "carrying a gun on his left side." He was with a woman and another man "carrying a gun and *** a baby with glasses." Luevano went to the restroom to call the police because "[she] thought they were drunk and with the gun that probably there was going to be a shooting in there." She could not complete the call because there was no reception and no one else tried to call the police. Hernandez and the others left "maybe *** four minutes" after she came out of the restroom.

¶ 6        The next time Luevano saw Hernandez was more than three years later in October 2010 at the furniture store where she worked. Hernandez "went to go see [Luevano's] coworker Geraldo" and she overheard them "talking about the scar on [her] nose and the shading of [her] shoes." Geraldo asked her if she wanted to become a model and whether she lived alone, and he took a picture of her. On cross-examination, she testified that Geraldo was a sales associate, so he "had to speak to a lot of men."

---

[1] While she did not testify as to how she learned Hernandez's name, her petition alleged that she "was able to get the stalker's name" through her church community.

¶ 7        A few months later in January 2011 at around 9:00 p.m., her co-worker Maricela was giving her and another co-worker, Alex, a ride home from work. Maricela received a phone call and "then she was to do what the phone call said to do. She told *** Alex that he was going to receive a text message and to do exactly as the text message said." Luevano saw a man with long, straight hair in a dark colored van in front of Maricela's car. She "look[ed] back quickly" and saw Hernandez in a "light beige" vehicle behind them, which did not have a license plate. This "happened right in front of the Bank of America *** so they have light on the streets" and she was able to see Hernandez. She spoke to the police the next day about the incident.

¶ 8        Luevano saw Hernandez "[t]he next day outside of [her] house." She called the police, who instructed her to take pictures and email them to the police. Hernandez was outside of her home "[a] lot. Sometimes even twice a day, three times a day" for three hours.

¶ 9        In December 2011, Luevano saw Hernandez at her church. He asked her "if [she] was a citizen of this country," "if [her] family was a citizen of this country" and "what other part of the country [they] were from."  On cross-examination, she added that, "his hand was like this as if he was going to strike me like that." Hernandez was sometimes alone at church, but her petition alleged that during this incident, Hernandez was with his wife and nephew. She e-mailed the police about the incident. Luevano testified that after she saw Hernandez at church, she would see him "everywhere [she goes]" including the grocery store, the mall, while she is driving, and at other churches she attended.

¶ 10       In June 2017, Luevano saw Hernandez at a grocery store. He "had a package" and asked her if she lost something. Luevano called 911. The dispatcher told her to stay in the store, but she refused to because "[she's] seen him with a gun" before and had to get out of the store in case

there was a shooting.[2] As Hernandez was leaving the store, "he kept on telling [her] did you lose something. But [she] was on the 9-1-1 call." She followed Hernandez out of the store, described him to the dispatcher, and gave the plate number of the "new vehicle that [she] had seen him in." Hernandez was driving through the alley but was blocked by another vehicle. He reversed down the alley and Luevano screamed for him to stop because he "was about to run [her] over." On cross-examination, Luevano admitted that Hernandez was "talking to other people" at the grocery store.

¶ 11        In November 2017, Hernandez was "driving right next to [her] *** doing these hand gestures at [her] ***. And then from the window he was saying that he was in a gang and he was going to kill [her]." Luevano and Hernandez "had to go to court" for that incident. Hernandez "got a bond" and was ordered to stay away from her. Since then, Luevano has seen Hernandez "[a] lot of times" when she is driving, at restaurants, and at the grocery store.

¶ 12        When asked why she believed Hernandez had been following her, Luevano explained,

> "I think the Respondent has been following me because of something that I saw in relation to the news. It corresponds exactly to what this man has been doing to me. *** [I]n the news on Univision Channel 66 I saw that two sex slaves had escaped and they said not to believe anybody that spoke to you about being models. So these people asked me if I wanted to be a model. And then that occurred in December of 2008. *** And then shortly after that it comes out on the news and it's exactly what I went through with the van. It came out that lady had gotten abducted. And then what I had heard them saying on the news how they are using my shoes and my nose and my scar to identify me."

---

[2] Luevano did not testify that Hernandez had a gun at the grocery store. We assume she is referring to the incident that occurred at the restaurant in September 2007.

¶ 13    Luevano testified that due to these events, she went to therapy, quit her job, left the country, and tried to join a convent but was unable to do so "because [she had] a stalker" and had to continue therapy. She switched therapists because Hernandez "was following [her] there."

¶ 14    On cross-examination, Luevano admitted that she e-mailed the police about a "bald man with white hair on the sides" named Lido that was following her and kept looking at her nose and her scar at church. She also told the police about a "con man who had an ice pop stand," who she believed was also following her and was the man she "was able to identify from being in the van."

¶ 15    At the close of Luevano's testimony, Hernandez made a motion for a directed finding, arguing that "we don't have any threats or incidents of him following at all" and there were "issues with the identification because as she's told you she has told police about many people." The trial court granted the motion, explaining that:

> "On a motion for a directed finding, the Court does have to view all evidence in the light most favorable to the Petitioner. There has been some testimony as to Ms. Luevano observing what may have been Mr. Hernandez. However, on each incident that was testified to, there was no testimony as to how that particular encounter rose to the level of a type of stalking conduct other than viewing this person, the person perhaps asking questions. Therefore, I don't believe that the Petitioner has established a prima facie case of stalking as defined by the Stalking No Contact Order Act."

¶ 16                                ANALYSIS

¶ 17    The Act allows victims of stalking to seek a civil remedy ordering offenders to stay away from them. 740 ILCS 21/5 (West 2016). "Stalking" is defined as "engaging in a course of conduct directed at a specific person, and he or she knows or should know that this course of

conduct would cause a reasonable person to fear for his or her safety *** or suffer emotional distress." 740 ILCS 21/10 (West 2016). A "course of conduct" is two or more incidents "including but not limited to acts in which a respondent directly, indirectly, or through third parties *** follows, monitors, observes, surveils, or threatens a person, workplace, school, or place of worship [or] engages in other contact ***." *Id.* "Contact" is

> "any contact with the victim, that is initiated or continued without the victim's consent, or that is in disregard of the victim's expressed desire that the contact be avoided or discontinued, including but not limited to being in the physical presence of the victim; appearing within the sight of the victim; approaching or confronting the victim in a public place or on private property; appearing at the workplace or residence of the victim ***." *Id.*

¶ 18    A petitioner must prove stalking by a preponderance of the evidence. 740 ILCS 21/30 (West 2016). The parties agree that the trial court's ruling denying Luevano's petition for a stalking no contact order should be affirmed unless it is against the manifest weight of the evidence. See *McNally v. Bredemann*, 2015 IL App (1st) 134048, ¶ 12; *Best v. Best*, 223 Ill. 2d 342, 350 (2006) (findings based on the presence of a preponderance of the evidence are reviewed under the manifest weight standard of review). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best*, 223 Ill. 2d at 350 (citing *In re D.F.*, 201 Ill. 2d 476, 498 (2002)).

¶ 19    Luevano argues that "[t]he trial court's determination was against the manifest weight of the evidence" because the trial court "ignored ample evidence that Mr. Hernandez's behavior amounted to stalking."

¶ 20        In this case, the trial court's finding that Luevano failed to show that Hernandez stalked her was not "unreasonable, arbitrary, or not based on the evidence presented." See *id.* For Hernandez's actions to constitute stalking, he must have "engaged in a course of conduct directed at [Luevano]" and he "kn[ew] or should [have known] that [his] course of conduct would cause a reasonable person to fear for his or her safety *** or suffer emotional distress." 740 ILCS 21/10; *Piester v. Escobar*, 2015 IL App (3d) 140457, ¶ 12 ("[t]he focus is on whether the stalker's behavior would cause a reasonable person to be fearful for her safety or to suffer emotional distress"). A "reasonable person" is defined as "a person in the petitioner's circumstances with the petitioner's knowledge of the respondent and the respondent's prior acts," but this is an objective standard. 740 ILCS 21/10; see also *Nicholson v. Wilson*, 2013 IL App (3d) 110517, ¶ 15 (rejecting respondent's argument that the Act's definition of "reasonable person" is subjective and finding that respondent engaged in conduct "which, from an objective standpoint would cause a reasonable person to have some fear for his or her safety or cause *** emotional distress").

¶ 21        Luevano's testimony does not establish that Hernandez knew or should have known that his conduct would cause a reasonable person in her position to fear for her safety or cause her emotional distress. There is no evidence that the first time Luevano saw Hernandez that he even acknowledged her or engaged in any interaction with her, and she was the only person who showed any concern by attempting to call the police. Three years later, Luevano's co-worker Geraldo asked her questions and took a picture of her. While a "course of conduct" can be satisfied "through third parties," (see 740 ILCS 21/10), there is also no evidence that Hernandez was with Geraldo or that Hernandez was still in the store when Geraldo asked her personal questions or took her picture.

¶ 22    Regarding the incident that occurred when Luevano's co-worker Maricela was driving her home, she did not testify about where the call came from, whether Alex received a text message or what that message said, and she did not call the police until the next day. During the incident at the grocery store, Hernandez only asked her if she had "lost something" and Luevano followed Hernandez out of the store after he was already leaving. At her church, Hernandez asked Luevano personal questions about herself and her family. But none of these encounters would cause a reasonable person to fear for her safety or suffer emotional distress. Contra *Piester*, 2015 IL App (3d) 140457, ¶¶ 14-15 (trial court properly entered stalking no contact order against respondent who "followed, monitored, observed, and threatened [petitioner]" and the parties had a history of confrontations); *McNally*, 2015 IL App (1st) 134048, ¶ 13 (respondent's conduct would cause a reasonable person to fear for her safety where he sent repeated e-mails accusing petitioner of robbing him of happiness, created 10 different aliases to e-mail her, criticize her on professional websites, and communicate with her friends and family, and appeared at her home).

¶ 23    Luevano also argues that "Hernandez knew or should have known that such behavior would cause [her] emotional distress" because she "testified that she called the police on multiple occasions." However, there is no evidence that Hernandez knew she contacted the police. In fact, Luevano often called or e-mailed the police the following day, and Hernandez would have had no way of knowing about any such contact. Compare *Piester*, 2015 IL App (3d) 140457, ¶ 15 (rejecting respondent's argument that she was unaware her actions scared petitioner where "the parties [had] a history of confrontation's, including attempts by both *** to obtain prior stalking no contact orders").

¶ 24        Although a reasonable person may have feared for his or her safety or suffered emotional distress when Hernandez drove next to Luevano "saying that he was in a gang and he was going to kill [her]," this incident alone does not constitute a "course of conduct" under the Act. See 740 ILCS 21/10 (course of conduct "means 2 or more acts"); see also *Henby v. White*, 2016 IL App (5th) 140407, ¶ 27 (petitioner failed to allege a course of conduct under the Act where there was no allegation that one of the two incidents would "cause a reasonable person to fear for his personal safety or to experience significant mental suffering, anxiety, or alarm").

¶ 25        Because a reasonable person would not have feared for his or her safety or suffered emotional distress from these encounters, we cannot conclude that Hernandez should have known that Luevano would suffer emotional distress or that his conduct amounted to stalking. We note that "other contact" that may constitute stalking under the Act can include "being in the physical presence of the victim," but, here, Luevano believed that multiple different people were stalking her. 740 ILCS 21/10. The trial court found that Luevano "*may*" have seen Hernandez on these occasions, but she did not establish that Hernandez's conduct arose to stalking under the Act, even when viewing the evidence in the light most favorable to Luevano. Under the manifest weight of the evidence standard, we "give deference to the trial court as the finder of fact, because it is in the best position to observe the conduct and demeanor of the parties and witnesses." *Best*, 223 Ill. 2d at 351. Under the facts of this case, the trial court's finding that Luevano failed to show Hernandez's conduct amounted to stalking was not against the manifest weight of the evidence.

¶ 26                                CONCLUSION

¶ 27        For the foregoing reasons, we affirm the denial of Luevano's petition for a stalking no contact order.

¶ 28        Affirmed.