NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 210729-U

NO. 4-21-0729

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 5, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| AHMAD H. AHMAD, | ) | Appeal from the |
| Petitioner-Appellant, | ) | Circuit Court of |
| v. | ) | Macon County |
| MOHAMMED QATTOUM, | ) | No. 20OP710 |
| Respondent-Appellee. | ) | |
| | ) | Honorable |
| | ) | Lindsey A. Shelton, |
| | ) | Judge Presiding. |

---

JUSTICE LANNERD delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court's decision denying petitioner's request for a plenary stalking no contact order against respondent was not legally inconsistent with its decision to grant a plenary order in another case.

(2) The trial court's decision denying petitioner's request for a plenary stalking no contact order was not against the manifest weight of the evidence.

¶ 2    Petitioner, Ahmad H. Ahmad, appeals the trial court's denial of his request for a plenary stalking no contact order against respondent, Mohammed Qattoum. Ahmad argues the court's decision was (1) inconsistent with its decision to grant Majeda Owaida a stalking no contact order against Raida Qattoum and (2) against the manifest weight of the evidence. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    On December 29, 2020, Ahmad filed a verified petition for an emergency stalking no contact order against Mohammed. In the petition, Ahmad stated he had known Mohammed and

his wife, Raida, for many years. Beginning in October 2020, Ahmad and his family began receiving harassing calls and messages from unknown numbers. Ahmad alleged Mohammed and Raida were responsible. On December 20, 2020, Ahmad told Mohammed to leave him and his family alone and blocked Mohammed from calling or messaging him. Despite his request, the calls and messages from unknown numbers continued. This conduct caused Ahmad significant distress, and he feared for his safety. Based on these allegations, the trial court granted Ahmad's petition for an emergency stalking no contact order against Mohammed and set the matter for a plenary hearing.

¶ 5        Prior to the plenary hearing, Ahmad's close friend, Majeda, obtained an emergency stalking no contact order against Raida (Macon County case No. 21-OP-549) and the matter was set for a plenary hearing.

¶ 6        The trial court conducted contemporaneous plenary hearings in Ahmad's and Majeda's cases over four days from August through November 2021. At the conclusion of the hearings, the court granted Majeda a plenary stalking no contact order against Raida and included Ahmad as protected person thereunder. (Majeda's plenary stalking no contact order against Raida was the subject of a separate appeal; this court affirmed the trial court's decision. See *Owaida v. Qattoum*, 2022 IL App (4th) 210715-U.) However, the court denied Ahmad's petition for a plenary stalking no contact order against Mohammed.

¶ 7                              A. Plenary Hearings

¶ 8                              1. *Ahmad's Testimony*

¶ 9        Ahmad testified he had known Mohammed and Raida for approximately 17 to 18 years. In 2019, the relationship began to deteriorate after Ahmad declined two offers Mohammed and Raida made to purchase his restaurant. At a friend's request, in approximately November 2020,

Ahmad visited an empty restaurant building that was for sale. Mohammed and Raida previously planned to purchase this building; however, their deal fell through. While Ahmad viewed the building, Mohammed and Raida's relative confronted him. Shortly after this confrontation, Ahmad's mother and sister began receiving upsetting phone calls. Although the calls came from unknown numbers, Ahmad's mother sent him a message identifying Raida as the caller. Around the same time, Ahmad began getting hundreds of *harassing calls* from unknown numbers.

¶ 10      On December 20, 2020, Ahmad received multiple calls and messages from Mohammed. (Screenshots of these messages were admitted as Petitioner's exhibit A.) In these messages, Mohammed complained Ahmad's mother and sister made "allegations" against Raida. Mohammed wanted to meet with Ahmad to resolve this issue. Ahmad responded to the calls and messages by telling Mohammed to " 'Leave me alone. Leave my family alone. Leave my mother alone. Leave my brother alone.' " He also blocked Mohammed's phone number. Undeterred, Mohammed used WhatsApp to contact Ahmad again.

¶ 11      That same day, Ahmad also received numerous calls from unknown or blocked numbers. During one of those calls, the female caller said, " 'If anything bad happens to us, we're going to burn you.' " These calls and messages continued throughout 2021. Both Ahmad and Majeda noticed the calls and messages would get "more intense" when Majeda was at Ahmad's house. He believed some of the insulting messages he received were referring to Majeda. Ahmad was concerned for both his and Majeda's safety because of the calls and messages. He alerted the police to the situation and installed cameras at his home to "be safe from the Qattoums."

¶ 12      During his testimony, Ahmad presented an audio file of a voicemail he received from an unknown number in May 2021. (This audio file was admitted into evidence as Petitioner's exhibit D2.) The caller said, "I'm not going to leave her alone. Just wait on me." Ahmad identified

Raida's voice on this voicemail. According to Ahmad, Raida left this voicemail in response to a police report he made about Mohammed and Raida harassing him.

¶ 13 Numerous messages from "random numbers" were sent to Ahmad, and he claimed they were from Mohammed and Raida because of details contained within the messages. (Screenshots of these messages were admitted as Petitioner's exhibits Q and R.) One message, from July 2021, stated in part, " 'I cannot wait till you leave the country *** we will see what will happen.' " Ahmad mentioned during a previous court hearing that he would be unavailable in late July because he was traveling out of the country. He had not informed anyone else of his travel plans. Another message, from August 2021, stated " 'A restaurant that is not worth [$]50,000, you want to sell it for [$]80,000. You are money hungry and a thief.' " (In 2019, Ahmad wanted Mohammed and Raida to pay $80,000 to purchase his restaurant, but they only wanted to pay $50,000.) A third message from August 5, 2021, referenced " 'my son Ribhi.' " Mohammed and Raida have a son named Ribhi.

¶ 14 On multiple occasions, Ahmad's home security camera captured a vehicle passing his home, which Ahmad contended was Raida and Mohammed conducting surveillance on him and his home. On one occasion, around the same time the vehicle was captured by his camera, he received a call in which the female caller said, " 'I see the w*** is here today.' " Another time, Ahmad received a call in which the female caller said, " 'We're watching your house.' " (Screenshots from the camera footage were admitted into evidence as Petitioner's exhibit O.)

¶ 15 Finally, Ahmad also testified Mohammed called him a "lowlife" outside the courtroom on the first day of the plenary hearing. Ahmad noted calling someone a "lowlife" is a "huge insult" in his culture and Ahmad believed a physical altercation would have occurred if he had responded.

¶ 16                                    2. *Majeda's Testimony*

¶ 17          Majeda works for a nonprofit organization and worked at Ahmad's restaurant. Majeda described herself as Ahmad's "close friend" and said she sometimes stayed with him at his residence. She acknowledged Ahmad was married and his wife lived in Jordan. Majeda only met Mohammed and Raida once, while she was working at Ahmad's restaurant in the summer of 2020.

¶ 18          In November 2020, Majeda began receiving calls and messages containing "vulgar language and harassment" from numbers she did not recognize. Although the calls were from unknown numbers, Majeda recognized Raida's voice on the calls. On two occasions when Majeda did not answer, the female caller left a voicemail. The first voicemail from March 2021 said, " 'We're going to get you. We're going to get you. I gonna get you. I will get you.' " Majeda testified it was Raida's voice on this voicemail. The other voicemail, from April 2021, said " 'Are you going to put me in prison, you w***?' " Majeda recognized this voice as Raida's as well. (Audio files of these voicemails were admitted as Petitioner's exhibits M2 and J2, respectively.) Majeda previously heard Raida's voice at Ahmad's restaurant and from "the message that had been sent to [Ahmad's] sister and mother." Majeda also received vulgar messages stating she was trash, a w***, and had no mother or father. (These messages were admitted into evidence as Petitioner's exhibits V, W, and X.) As a result of these messages, Majeda felt unstable, emotional, frustrated, and intimidated.

¶ 19                                    3. *Raida's Testimony*

¶ 20          Raida testified she only met Majeda once, for a few minutes, at Ahmad's restaurant. She denied calling, sending any of the messages at issue, and that it was her voice on the voicemail

messages. Raida insisted she did not have Majeda's number. As to the vehicle captured on the camera footage outside Ahmad's home, Raida denied that it was her vehicle.

¶ 21                                    4. *Mohammed's Testimony*

¶ 22        Mohammed testified he had known Ahmad for many years and initially, they were friends. Over time, Mohammed also became friends with Ahmad's brother. In October 2020, Ahmad sent Mohammed a message telling Mohammed to leave Ahmad's brother alone and to " 'Leave us alone.' " Mohammed was busy with his son's wedding and did not respond to the message.

¶ 23        On December 20, 2020, Raida showed Mohammed messages from Ahmad's mother, which contained "all kinds of bad words." Mohammed admitted he called Ahmad three or four times that day to try and resolve the situation. Ahmad answered Mohammed's last call and told Mohammed to leave him and his family alone. When Mohammed asked to meet with Ahmad to discuss the situation, Ahmad declined and hung up. He tried calling Ahmad again, but Ahmad never answered. Using WhatsApp, Mohammed also sent Ahmad messages when Ahmad failed to answer his other calls or messages. According to Mohammed, he only called and messaged Ahmad so he could "solve the matter between me and him" and to "prove myself innocent and my wife." After December 20, 2020, Mohammed asserted he had not called or messaged Ahmad.

¶ 24        Mohammed's son had previously attempted to purchase a vacant restaurant building, but the deal ultimately fell through. Later, Mohammed's nephew saw Ahmad and another individual looking at the building and spoke with them. However, Mohammed denied any problems or issues with Ahmad about the vacant restaurant building.

¶ 25        When asked about his attempts to communicate with Ahmad, Mohammed denied making any calls or sending messages to Ahmad or Majeda from private numbers or numbers

different than his own. Further, Mohammed suspected Ahmad was sending the messages himself to make Mohammed and Raida look bad. Mohammed also testified the vehicle captured on Ahmad's camera was neither his nor Raida's vehicle.

¶ 26                                      B. Trial Court's Ruling

¶ 27          The trial court denied Ahmad's petition for a plenary stalking no contact order against Mohammed but granted Majeda's petition for a plenary stalking no contact order against Raida. The court explained its findings and credibility determinations as to each of the witnesses. With respect to Mohammed, the court found "[a]ctual contact that the Court has heard that Mohammed Qattoum has done, that the court finds he did commit himself, would be the insulting comment that he had said to Dr. Ahmad on the phone and then also outside of the courtroom." The court continued:

> "I do agree [Mohammed] admitted he had repeatedly called initially to try
> to work out the issues that they had. I didn't hear testimony that he continued to do
> that after that initial—I understand the parties disagree as to the repeated calling,
> the purpose behind it. I don't find that the other content or contact by [Mohammed]
> himself, I don't find that the other text messages or phone calls have been shown
> that it was *** by [Mohammed]."

¶ 28          The trial court then addressed conduct it attributed to Raida. The court began by stating,

> "I do find that there has been sufficient proof that shows a course of conduct to both
> Ahmad Ahmad, as well as Majeda Owaida.
>
>                        ***

*** I do find that those messages that I'm about to go through, text messages, as well as voicemails, were sent with the intent for it to get back to Majeda Owaida, even if it was on Ahmad Ahmad's phone."

¶ 29      In reaching its decisions, the trial court relied on Ahmad and Majeda's identification of Raida's voice on the voicemails and surveillance footage from Ahmad's home showing a vehicle identified by Ahmad as belonging to Mohammed and Raida at the same time Ahmad received harassing messages indicating the sender was watching his home and Majeda's movements. The court found "that is [Raida] placing both [Ahmad and Majeda] under surveillance, as well as making threatening and harassing statements."

¶ 30      The trial court allowed Ahmad to be added as a protected party under Majeda's plenary stalking no contact order against Raida.

¶ 31      This appeal followed.

¶ 32                                II. ANALYSIS

¶ 33      On appeal, Ahmad argues the trial court erred in denying his petition for a plenary stalking no contact order against Mohammed. He contends the court's decision was both against the manifest weight of the evidence and inconsistent with its decision to grant Majeda's petition for a plenary stalking no contact order against Raida. We disagree.

¶ 34      The Stalking No Contact Order Act (Act) provides a civil remedy for victims of stalking. 740 ILCS 21/5 (West 2020). Under the Act, " '[s]talking' means engaging in a course of conduct directed at a specific person" when the actor "knows or should know that this course of conduct would cause a reasonable person to fear for his or her safety *** or the safety of a third person or suffer emotional distress." 740 ILCS 21/10 (West 2020). " 'Course of conduct' means [two] or more acts, including but not limited to acts in which a respondent directly, indirectly, or

through third parties, by any action, method, device, or means follows, monitors, observes, surveils, or threatens a person." 740 ILCS 21/10 (West 2020). "A course of conduct may include contact via electronic communications." 740 ILCS 21/10 (West 2020). Contact is defined as

> "any contact with the victim *** including but not limited to being in the physical presence of the victim; appearing within the sight of the victim; approaching or confronting the victim in a public place or on private property; appearing at the workplace or residence of the victim; entering onto or remaining on property owned, leased, or occupied by the victim; placing an object on, or delivering an object to, property owned, leased, or occupied by the victim; electronic communication as defined in Section 26.5-0.1 of the Criminal Code of 2012; and appearing at the prohibited workplace, school, or place of worship." 740 ILCS 21/10 (West 2020).

¶ 35　　In proceedings under the Act, a petitioner must prove stalking by a preponderance of the evidence. 740 ILCS 21/30(a) (West 2020). "Proof by a preponderance of the evidence means that the fact at issue *** is rendered more likely than not." *People v. Houar*, 365 Ill. App. 3d 682, 686, 850 N.E.2d 327, 331 (2006).

¶ 36　　　　　A. Agency Relationship and Consistency of Judgments

¶ 37　　First, Ahmad argues the trial court's denial of his petition for a plenary stalking no contact order against Mohammed was inconsistent with its decision to grant Majeda's petition for a plenary stalking no contact order against Raida. Ahmad contends the court found an agency relationship existed between Mohammed and Raida, and this factual finding required the court to grant Ahmad's petition in order to avoid creating an inconsistent judgment with its order granting Majeda's petition against Raida. We disagree.

¶ 38     Ahmad claims the judgments between his case and Majeda's are legally inconsistent and cites *Redmond v. Socha*, 216 Ill. 2d 622, 837 N.E.2d 883 (2005), which delineates the standard of review for legally inconsistent verdicts. He attempts to analogize a case involving inconsistent verdicts to this case, which involves inconsistent judgments. However, a verdict is specific to a jury trial. See *Verdict*, Black's Law Dictionary (11th ed. 2009). In this case, there was no jury and therefore no verdict, so any argument the trial court's judgments should be reviewed under the standard of review for inconsistent verdicts is misplaced.

¶ 39     Ahmad asserts that, in a bench trial, inconsistent findings in different cases which affect the ultimate issue require reversal and remand. See *Regan v. Joseph P.*, 286 Ill. App. 3d 889, 677 N.E.2d 434 (1997). Ahmad argues that because the trial court made the factual finding that there was an agency relationship between Mohammed and Raida, the court's decision to deny his request for a plenary stalking no contact order against Mohammed is inconsistent with its order granting a plenary stalking no contact order for Majeda against Raida. His argument relies solely on the court's statement that Raida and Mohammed are "agents of each other."

¶ 40     The Act, for the purpose of determining accountability for the actions of others, invokes the accountability section of the Criminal Code of 2012, which states:

> "A person is legally accountable for the conduct of another when:
>
> > (a) having a mental state described by the statute defining the offense, he or she causes another to perform the conduct, and the other person in fact or by reason of legal incapacity lacks such a mental state;
> >
> > (b) the statute defining the offense makes him or her so accountable; or
> >
> > (c) either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or

attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2 (West 2010).

Here, the record does not support Ahmad's contention that the trial court made an agency finding sufficient to invoke the accountability statute. The record is devoid of any discussion of the elements required to establish accountability under the statute or even any reference to the accountability statute itself. In fact, the sole reference to any *agency relationship* occurs when the court stated,

> "There was another text message that was sent after that, that was, 'File as many cases against us if you want,' but, again, the Court shows context as to who is sending the messages. Whether that was specifically from [Mohammed] or [Raida], I do consider that as from [Raida]. *I believe they're agents of each other.* They're working for the same goal. So I do find that whether that was [Mohammed] or [Raida], it does further [Raida's] intent to harass both [Majeda and Ahmad]." (Emphasis added.)

This comment appears to be a mere observation by the court that Mohammed and Raida are working toward the same goal. This single observation is not the equivalent of the court making a finding that the two are legally accountable for the other's actions under the accountability statute. Without any type of accountability finding, Ahmad cannot argue that there was an agency relationship established between Mohammed and Raida, such that Raida's actions would be attributable to Mohammed.

¶ 41 As we have concluded that the trial court did not find an agency relationship existed between Mohammed and Raida that would invoke the accountability statute, there is no basis to support Ahmad's inconsistent judgments argument. Therefore, the court's decision denying

Ahmad's request for a plenary stalking no contact order against Mohammed was not inconsistent with its judgment granting a plenary order for Majeda against Raida.

¶ 42                                    B. Manifest Weight of the Evidence

¶ 43        Ahmad next argues the trial court's decision to deny his request for a plenary stalking no contact order against Mohammed was against the manifest weight of the evidence. According to Ahmad, although the court "discounted a substantial amount of circumstantial evidence," he presented sufficient proof of Mohammed's conduct to support the entry of a plenary stalking no contact order against Mohammed. We disagree.

¶ 44        This court will not overturn a trial court's denial of a petition for a stalking no contact order unless the ruling is against the manifest weight of the evidence. See *McNally v. Bredemann*, 2015 IL App (1st) 134048, ¶ 12, 30 N.E.3d 557; see also *Best v. Best*, 223 Ill. 2d 342, 349-50, 860 N.E.2d 240, 244-45 (2006) (findings based on the presence of a preponderance of the evidence are reviewed under the manifest weight standard of review). A court's ruling is against the manifest weight of the evidence only if " 'the opposite conclusion is clearly apparent or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented.' " *McNally*, 2015 IL App (1st) 134048, ¶ 12 (quoting *Nicholson v. Wilson*, 2013 IL App (3d) 110517, ¶ 22, 993 N.E.2d 594). When this court reviews a case under the manifest weight standard, "we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain." *In re D.F.*, 201 Ill. 2d 476, 498-99, 777 N.E.2d 930, 943 (2002). "A reviewing court, therefore, must not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *D.F.*, 201 Ill. 2d at 499.

¶ 45 Ahmad argues the uncontradicted evidence showed Mohammed did more than make "just a phone call [from Mohammed to Ahmad] to straighten things out." Ahmad misconstrues the trial court's findings. The court clearly considered more than just a single phone call from Mohammed to Ahmad.

¶ 46 The evidence showed Mohammed called and messaged Ahmad several times on December 20, 2020, before Ahmad blocked Mohammed. Mohammed admitted to these repeated attempts to contact Ahmad to try to resolve the issues between them, including continuing to contact Ahmad after Ahmad told Mohammed to leave him alone. However, Mohammed denied calling or messaging Ahmad after December 20, 2020, either from his number or from any phone numbers that were not his own. The trial court specifically noted it found Mohammed repeatedly contacted Ahmad to "try to work out the issues that they had had."

¶ 47 Ahmad asserts the trial court "discounted a substantial amount of circumstantial evidence," including "the flood of calls and messages to [his] phone that contained information suggesting they came from [Mohammed and Raida]" and Mohammed's "surveillance of his restaurant." " 'Circumstantial evidence is the proof of facts and circumstances from which a [fact finder] may infer other connected facts which usually and reasonably follow, according to the common experience of mankind.' " *Olson v. Williams All Seasons Co.*, 2012 IL App (2d) 110818 ¶ 26, 974 N.E.2d 914 (quoting *Housh v. Swanson*, 203 Ill. App. 3d 377, 381, 561 N.E.2d 321, 323 (1990)). In the context of civil actions, our supreme court has emphasized "the use of circumstantial evidence is not limited to those instances in which the circumstances support only one logical conclusion. Instead, circumstantial evidence will suffice whenever an inference may reasonably be drawn therefrom ***." *Mort v. Walter*, 98 Ill. 2d 391, 396, 457 N.E.2d 18, 21 (1983).

Accordingly, "[c]ircumstantial evidence does not need to exclude all other possible inferences or support only one logical conclusion." *Olson*, 2012 IL App (2d) 110818, ¶ 26.

¶ 48 The trial court, after hearing all the evidence presented and after weighing the credibility of the witnesses and their testimony, determined there was not sufficient evidence presented by Ahmad to prove stalking by Mohammed. The court concluded Ahmad did not prove Mohammed made any calls or sent any messages to Ahmad from unknown numbers. Thus, it is clear the court considered the circumstantial evidence; however, it was not sufficient to infer Mohammed was the caller. Therefore, the court denied Ahmad's request for a plenary stalking no contact order. The record is devoid of evidence suggesting the opposite conclusion is readily apparent or that the court's judgment was not based on the evidence presented. Ahmad points to evidence not specifically discussed in the court's ruling to support his argument the court's decision was against the manifest weight of the evidence. However, the existence of some evidence supporting Ahmad's claim against Mohammed does not mean the court's finding was against the manifest weight of the evidence. See *Department of Transportation ex rel. People v. 151 Interstate Road Corp.*, 209 Ill. 2d 471, 488, 810 N.E.2d 1, 11 (2004) (finding it is insufficient for a reversal under the manifest weight standard to simply show the record could support a contrary decision).

¶ 49 In this case, based on the evidence presented, the trial court, as the finder of fact, determined Ahmad failed to establish Mohammed made additional contact with Ahmad outside the initial repeated contact on December 20, 2020. Thus, the court did not find Ahmad established a course of conduct by Mohammed, which is a necessary element to prove stalking by a preponderance of the evidence. 740 ILCS 21/10 (West 2020). As discussed above, to establish a course of conduct, a petitioner must show "[two] or more acts, including but not limited to acts in which a respondent directly, indirectly, or through third parties, by any action, method, device, or

-14-

means follows, monitors, observes, surveils, or threatens a person." 740 ILCS 21/10 (West 2020). Here, other than the initial attempts to contact Ahmad, the court found Ahmad failed to prove any additional acts which were attributable to Mohammed. Moreover, the court indicated it ultimately found a majority of the conduct to have been committed by Raida, and not Mohammed, for the purpose of harassing Majeda and Ahmad. Accordingly, we find the court's denial of Ahmad's request for a plenary stalking no contact order was supported by the record and not against the manifest weight of the evidence.

¶ 50                                  III. CONCLUSION

¶ 51          For the reasons stated, we affirm the trial court's judgment.

¶ 52          Affirmed.